**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 30, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LANNY BART JARVIS,

        Plaintiff - Appellant,

v.

JOHN E. POTTER, Postmaster
General of the United Postal Service,

        Defendant - Appellee.

No. 06-4090

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:04-CV-778-TC)**

David J. Holdsworth, Sandy, Utah, for Plaintiff - Appellant

Jared C. Bennett, Assistant United States Attorney (Brett L. Tolman, United States Attorney, with him on the brief), Salt Lake City, Utah, for Defendant - Appellee

Before **HARTZ**, **McKAY**, and **GORSUCH**, Circuit Judges.

**HARTZ**, Circuit Judge.

Lanny Bart Jarvis was terminated from his position at the United States Postal Service because of concerns about the danger he posed to coworkers. On August 24, 2004, he filed suit in the United States District Court for the District

of Utah against the Postal Service, contending that it had violated the Vocational Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. §§ 701 et seq. He contended that it had (1) discriminated against him by failing to accommodate his disability, post-traumatic-stress disorder (PTSD); and (2) retaliated against him for having engaged in the protected activities of seeking an accommodation and filing a discrimination complaint with the Equal Employment Opportunity (EEO) office. The district court granted summary judgment in favor of the Postal Service on both claims. It ruled that (1) Mr. Jarvis was not a qualified individual under the Rehabilitation Act because he posed a direct threat that could not be reasonably accommodated and (2) he had failed to produce evidence that the Postal Service's reasons for firing him were pretextual. Mr. Jarvis filed a timely notice of appeal. We have jurisdiction under 28 U.S.C. § 1291. We affirm except for some components of his retaliation claims that were not addressed below; we reverse and remand to the district court with respect to those matters.

## I.     BACKGROUND

Mr. Jarvis is a decorated Vietnam War veteran. In 1988 he began working for the Postal Service after a medical examination determined that he was fit for duty despite several war injuries. He first learned that he had PTSD sometime in 1998 or 1999, when, on the advice of a coworker and fellow veteran, he went to the Veteran's Affairs hospital, was tested, and received a disability rating for

PTSD. The diagnosis did not keep him from continuing to work for the Postal Service.

After working as a mail handler he applied in 2001 for a custodial position at Provo's East Bay facility because the walking requirements of the mail-handler position aggravated his war injuries. He told his new supervisor that he suffered from PTSD and did not like people coming up behind him and touching him. It does not appear that he requested any accommodation. Not long after he began his custodial job, the Postal Service expanded the facility and the additional walking caused his war injuries to bother him again. A smaller facility, located in Spanish Fork, had an opening, and he transferred there in 2002. Once at Spanish Fork he started having PTSD-related incidents with coworkers.

## A. PTSD-Related Incidents

### 1. Cindy Frazier

On two separate occasions Mr. Jarvis struck his coworker Cindy Frazier when she startled him. The first incident occurred in late 2002 or early 2003 while he was waiting to punch in for work at 9:30 a.m. He was daydreaming near the time clock when he heard footsteps approaching. When he turned he saw out of the corner of his eye something coming at him quickly, so he "just put [his] hand out and [Cindy Frazier] run her breast into the palm of [his] hand." Aplt. App. at 158. The second incident occurred in early 2003 while he was buffing the floor. Again he saw something coming toward him. He stuck his foot out and

-3-

kicked Ms. Frazier just below the knee. Ms. Frazier did not report either of these incidents to her supervisor.

### 2. LesLee Bishop

Mr. Jarvis had a similar incident involving LesLee Bishop, the officer-in-charge of the Spanish Fork facility. In May 2003 he was vacuuming her office before her expected arrival at 6:00 a.m. Because the vacuum was loud he did not hear her when she arrived about five minutes early. According to Mr. Jarvis, Ms. Bishop came right up behind him and said "Good morning Bart." *Id*. at 149. Startled, Mr. Jarvis turned around with clenched fists to defend himself. Realizing that it was Ms. Bishop, he relaxed and apologized for his reaction. According to his deposition, he said:

> I'm sorry, LesLee. I didn't mean to startle or scare you, but I'm real jumpy. I've been to Vietnam and I've got PTSD. . . . I might hurt somebody, LesLee . . . you ought to tell the rest of the crew that I have PTSD and to leave me alone, don't be scaring me. If they want to talk to me or they need me to do something for them, have them come around in front of me or say something in a normal tone of voice before they approach me from the back.

*Id*. at 150. She was not overly disturbed by the incident; she testified at her deposition that his reaction had surprised, rather than frightened, her. She also testified that she did not recall Mr. Jarvis's telling her that he had PTSD, or that he had a startle response, just that he was "a little jumpy." *Id*. at 266. Nor did she recall his asking her to tell other employees that he was jumpy or had a startle

response.  But after that incident she was careful not to startle Mr. Jarvis, always announcing her presence from a distance when approaching him from behind.

**3.      Al Nielsen**

On June 16, 2003, Ms. Bishop asked Mr. Jarvis to fix the lights on Larry Palmer's mail truck.  He went to Mr. Palmer's mail-sorting case to get the keys, entered the case, and had a conversation with Mr. Palmer and another mail carrier.  He started to back out of the case but stopped when Mr. Palmer resumed talking.  He then felt two big hands forcefully grab his arms from behind, causing him to lose his balance.  He stepped forward, regained his balance, and locked the arm of the "attacker," Al Nielsen.  At his deposition he explained what happened next:

A.    So I locked his wrist here so the only thing he's got to hold me with is his thumb, so his thumb against my deltoids, he can't hold me.  I kind of act like I'm struggling with him, so I'm actually putting his wrists right there so all he has is his thumb, okay.  So when I got his wrist where I want it, then I break it loose and . . . raised [my left] arm, because when you raise your arm above your shoulder you start losing your strength, so you drop. . . it back down to shoulder height or lower.  So he dropped his arm down here, and I put my elbow underneath his arm and it covered up his eyes so he couldn't see, and it left all his vital organs open.
Q.    So what did you do?
A.    End of story.
Q.    No, it's not the end of the story, what did you do, did you hit him?
A.    Well, I – I didn't hit him with a fist, I hit him with an open palm and kind of hit him and pushed him.
Q.    Where did you hit him?
A.    Right in the heart.

-5-

Q. How hard did you hit him?
A. Not hard enough to hurt him.

*Id*. at 155–56. Mr. Jarvis further explained his state of mind at the time:

> *I was ready to kill the guy.* I didn't know where I was at, I was focused—when you train self-defense, and jiu-jitsu, you are a focused person, when you think your life is in danger you are very focused, you don't hear nothing. . . . So I hit him like that, and he kind of went over like that. And my brain—you've got to know how fast your brain works, my brain says, okay, now he's down a little bit, just push his head down and hit him in the nose four or five times with your knee. And something else told me from my training, it says, [your] deltoids will probably not have enough power to overpower his back muscles if he tries to resist, so all you have to do is grab his hair and pull forward and he will automatically come down, then you can hit him four or five times in the nose and he will just about be out if not out for sure. Then you've already got ahold of his hair, all you have to do is reach under, grab his chin, and just—and he's gone.
> And so I reached up to grab his hair, and I seen the lights. Why, I don't know, I guess the good Lord saved me, I don't know. But I reached up to grab the back of his head and his hair, and I seen the lights, and I just kind of glanced around and I seen the cases, and then I seen my shiny floor, and then I seen the office, and then it struck me where I was at. And I just said, no, no, no, no, don't do it here. *And it scared the hell out of me. And that's what I'm afraid I might do to somebody else.*

*Id*. at 161–63 (emphasis added).

Mr. Palmer, who witnessed the incident, described it less ominously. On July 2, 2003, he gave Ms. Bishop a written statement that Mr. Nielsen had "goosed or poked" Mr. Jarvis, who then "instinctively swung and hit [Nielsen] in the shoulder." *Id*. at 278. In his later deposition Mr. Palmer testified that Mr. Jarvis was in the mail case with his back to the aisle when "Mr. Nielsen

walked by and poked him" from behind. *Id.* at 247 (Larry Palmer Dep.).

Mr. Jarvis then "swung around and hit him on the high shoulder." *Id.* Mr. Palmer characterized the event as a "so what deal." *Id.* Mr. Nielsen apparently thought that the incident was more serious and reported it to Ms. Bishop. Her initial assessment was that the situation was probably just due to Mr. Jarvis's "jumpiness," *id.* at 268, that he needed some help, and that she would deal with it after she returned from a two-week vacation.

On July 2, 2003, shortly after Ms. Bishop's return, Postal Inspector Craig Glende investigated the incident. The depth of his investigation is unclear; it appears that he did not meet with Mr. Palmer (and had left by the time Mr. Palmer gave his written statement to Ms. Bishop), but he did interview Mr. Jarvis and Ms. Frazier. In any event, Mr. Jarvis was handed a letter on July 2 placing him on administrative leave with pay, effective July 3, and the next day he received a letter dated July 2 informing him that he was being placed in off-duty-without-pay status, effective July 5. Although the second letter contained no explanation for the change in his pay status, it did explain that he was being placed off duty because he had struck and kicked coworkers, and "retaining [him] on-duty may be injurious to others." *Id.* at 288.

Mr. Jarvis appealed this decision. On July 8, 2003, the Postal Service held a due-process meeting. Mr. Jarvis said that if he hit someone in the right place, he could kill him; that his PTSD was getting worse; that he "c[ould] no longer

stop the first blow"; and that he could not safely return to the workplace. *Id*. at 46–47. At the meeting Mr. Jarvis asked Ms. Bishop to begin the paperwork for a medical-disability retirement, so that he could avoid being fired. In addition, he volunteered to request that his health-care practitioner, Sonia Hales, a board-certified advanced-practice registered nurse, send Ms. Bishop a letter explaining his PTSD symptoms. Apparently intended to support his medical retirement rather than his continued employment, the letter, which was faxed to Ms. Bishop on July 9, did not minimize the risk that he posed. It said:

> It was brought to my attention that Mr. Jarvis had recently been involved in a physical altercation with another colleague. Mr. Jarvis who is currently under treatment for Post Traumatic Stress Disorder (PTSD) in the Veterans Administration Health Care System (VAHCS) had a scheduled appointment with me today. As I reviewed documentation from the past three years several health care providers have noted the severity of his symptoms. PTSD is a chronic disorder and the accompanying symptoms of this illness are very disruptive to an individual's ability to function in every day living and more so in the work place.
>
> The recent event involving Mr. Jarvis was unfortunate for all involved. . . . [M]any veterans with PTSD, including Mr. Jarvis[,] experience on going intense psychological distress from both internal (perceived threats) and external (loud noise/unexpected touching) cues. . . . [M]any of these cues . . . resemble . . . past trauma, i.e. combat situations. Physical reactivity when exposed to any type of perceived or real threat often includes aggressive/violent behavior that is difficult for the Veteran to recognize or manage until after the event has occurred.
>
> Due to the chronic nature of PTSD it is not likely Mr. Jarvis's symptoms will dissipate in the near future. . . . Unfortunately, the unpredictable nature of PTSD symptoms may pose some threat in the work place. Mr. Jarvis has identified his work at the Postal Service

as a significant stressor in his life; a medical retirement may be beneficial for him at this time.

*Id*. at 173.

## B. Termination

The Postal Service sent Mr. Jarvis a letter dated July 17, 2003, informing him that in no sooner than 30 days he would be removed from the Postal Service as unfit for duty. The letter cited the following reasons for his removal: (1) the two incidents involving Ms. Frazier, (2) the Nielsen incident, (3) the letter from Sonia Hales about his PTSD, and (4) his statements at the due-process meeting that if he hit someone in the right place he could kill him, that his PTSD was getting worse and that he could no longer stop the first blow, and that he could not safely return to the workplace. The letter quoted sections of the Postal Service's Employee and Labor Relations Manual relating to behavior and unacceptable conduct, as well as a Postal Service District "Zero Tolerance Policy," which forbids "[a]ny act of physical violence," and "any actual, implied, or veiled threat," *id*. at 47 (internal quotation marks omitted).

Also on July 17 Mr. Jarvis met with the EEO office and filed a complaint apparently alleging that the Postal Service was discriminating against him on the basis of a mental disability. (The record contains no EEO complaint by Mr. Jarvis.) Shortly thereafter he filed a second EEO complaint alleging retaliation. He then received a letter of decision dated August 12, 2003,

informing him that he was being removed from the Postal Service effective August 18, 2003. He may have filed a third EEO complaint, but that is unclear from the record.

In the meantime, on July 25, 2003, Mr. Jarvis requested that he be allowed to access his accrued vacation and sick leave while he applied for a disability retirement. In response, the Postal Service apparently offered Mr. Jarvis the opportunity to resign rather than be terminated if he would agree to do so before February 1, 2004, regardless of whether his application for a medical-disability retirement had been granted. Perhaps interpreting this offer as retaliation for his having filed EEO complaints, he rejected it. It then appears that Mr. Jarvis appealed his termination through the Merit Systems Protection Board, but the record contains no information on administrative efforts to resolve the dispute. Mr. Jarvis ultimately received disability-retirement benefits.

## C.   District-Court Proceedings

On August 24, 2004, Mr. Jarvis filed his complaint in federal court alleging that the Postal Service had failed to accommodate his disability, in violation of the Rehabilitation Act, and had retaliated against him for filing EEO complaints by (1) failing to accommodate him, (2) failing to send him for a fitness-for-duty examination, (3) suppressing exonerating evidence during the investigation into the Nielsen incident, (4) proposing that he be terminated and then terminating

him, (5) engineering a "constructive discharge," *id*. at 15, and (6) "otherwise treating [him] in a harsh and disparate manner," *id*. at 16.

More than a year later, on November 14, 2005, the Postal Service moved for summary judgment, contending that Mr. Jarvis had failed to establish a prima facie case of discrimination because he was not a "qualified individual" under the Rehabilitation Act. Because he posed a direct threat to his coworkers, it argued, Mr. Jarvis was not qualified to perform the essential functions of his job. It also argued that his retaliation claim failed because the evidence showed that he had been terminated for having engaged in violent acts towards his coworkers and posing a threat to them, not for having filed EEO complaints.

On March 17, 2006, the district court granted the Postal Service's motion. It ruled that Mr. Jarvis posed a direct threat to the health and safety of others because he reacted violently when startled. This risk could not be eliminated by reasonable accommodation, it said, because his requested accommodation—that Ms. Bishop inform his coworkers of his PTSD and direct them to announce themselves before approaching him—would not eliminate the possibility that he would react violently to being startled accidentally. Furthermore, his requested accommodation was not reasonable because it attempted to shift to coworkers the burden of preventing him from engaging in violent conduct. Finally, it held that his termination was not retaliation for his having engaged in protected activity

-11-

because he could not show that the reason offered by the Postal Service for his termination was pretextual.

## II.    DISCUSSION

### A.    Standard of Review

We review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied. *See Cisneros v. Aragon*, 485 F.3d 1226, 1228 (10th Cir. 2007). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The purpose of a summary judgment motion . . . is to determine whether there is evidence to support a party's factual claim. Unsupported conclusory allegations thus do not create a genuine issue of fact." *L&M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000).

### B.    Discrimination Claim

#### 1.    Applicable Law

Section 504(a) of the Rehabilitation Act, 29 U.S.C. § 794(a), states:

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program receiving Federal financial assistance or under any program

-12-

or activity conducted by any Executive Agency or by the United
States Postal Service.

To establish a prima facie case of discrimination under the Rehabilitation Act, the plaintiff must show "(1) that [he] is disabled under the Act; (2) that he would be 'otherwise qualified' to participate in the program; (3) that the program receives federal financial assistance (or is a federal agency [or the Postal Service]); and (4) that the program has discriminated against the plaintiff." *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004). Section 504(d) further states that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under . . . the Americans with Disabilities Act of 1990 [(ADA)] . . . ." We therefore look to the ADA for guidance in resolving Rehabilitation Act claims.

The Postal Service does not dispute on appeal that Mr. Jarvis is an individual with a disability. *See* 29 U.S.C. § 705(20)(A) (defining *individual with a disability*). The issue before us is whether he is "otherwise qualified." The ADA defines *qualified individual with a disability* as one who "with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). In other words, one who cannot perform the essential functions of the job, even with a reasonable accommodation, is not an "otherwise qualified" individual. A section of the ADA entitled

-13-

"Defenses" permits employers to use appropriate qualification standards. In pertinent part it states:

> It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards . . . that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation.

42 U.S.C. § 12113(a). Of particular significance in this case, the following subsection provides that "qualification standards may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." *Id*. § 12113(b) (internal quotation marks omitted).

The Equal Employment Opportunity Commission (EEOC) is authorized by 42 U.S.C. § 12116 to promulgate regulations to implement the above provisions of the ADA. *See* 29 C.F.R. § 1630.1–.16. "Those regulations are entitled to a great deal of deference." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1165 n.5 (10th Cir. 1999) (citing *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 115 (1988)); *see also Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 899 n.3 (10th Cir. 1997). The Postal Service has promulgated regulations under the authority of 29 U.S.C. § 794(a) that apply the EEOC's regulations to the Rehabilitation Act. *See* 39 C.F.R. § 255.5 (2007) (EEOC regulations contained in 29 C.F.R. part 1614 apply to employment with the Postal Service); 29 C.F.R. § 1614.203 (2007)

(EEOC regulation adopting for Rehabilitation Act the standards contained in regulations promulgated under the ADA at 29 C.F.R. part 1630).

An EEOC regulation defines *direct threat* as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2®. It further provides:

> The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;
> (3) The likelihood that the potential harm will occur; and
> (4) The imminence of the potential harm.

*Id.*

Courts generally have held that the existence of a direct threat is a defense to be proved by the employer. *See Branham v. Snow*, 392 F.3d 896, 906 (7th Cir. 2004) (burden is on employer to show employee posed a direct threat); *Echazabal v. Chevron, U.S.A., Inc.*, 336 F.3d 1023, 1027 (9th Cir. 2003) (burden of establishing direct threat is on employer); *see also Taylor v. Rice*, 451 F.3d 898, 905–06 (D.C. Cir. 2006) (characterizing direct threat as defense); *McGeshick*, 357 F.3d at 1151 ("[I]t is a defense to claims under the Rehabilitation Act that an employee may pose a 'direct threat' to the welfare of others."). We have

-15-

recognized an exception to the general rule: "[W]here the essential job duties necessarily implicate the safety of others, then the burden may be on the plaintiff to show that she can perform those functions without endangering others." *McKenzie v. Benton*, 388 F.3d 1342, 1354 (10th Cir. 2004) (brackets omitted) (quoting *Rizzo v. Children's World Learning Ctrs., Inc.* 213 F.3d 209, 213 n.4 (5th Cir. 2000)) (plaintiff was police officer); *EEOC v. Amego, Inc.*, 110 F.3d 135, 142–44 (1st Cir. 1997) (whether employees pose a direct threat is part of the analysis of whether they are otherwise qualified, when essential job functions concern safety of others). That exception is inappropriate in this case because the essential duties of a Postal Service custodian do not "necessarily implicate the safety of others." *McKenzie*, 388 F.3d at 1354.

In evaluating an employer's direct-threat contention, the fact-finder does not independently assess whether it believes that the employee posed a direct threat. Nor must it accept the contention just because the employer acted in good faith in deciding that the employee posed such a threat. As we understand *Bragdon v. Abbott*, 524 U.S. 622 (1998), the fact-finder's role is to determine whether the employer's decision was objectively reasonable. In *Bragdon* the defendant refused to provide dental care in his office to an HIV-positive patient. The patient alleged discrimination in violation of the ADA. After affirming the circuit court's holding that HIV infection is a disability under the ADA, the Court considered whether the patient was entitled to summary judgment on the dentist's

-16-

contention that her HIV posed a direct threat to his health and safety. *See id*. at 648. The Court rejected the proposition that the dentist's good-faith belief that she posed a direct threat relieved him of liability. *See id*. at 649. But it also ruled that the circuit court properly refused to consider evidence of safety that was not available to the dentist when he made his decision. *See id*. at 650. The Court said that the proper test was the "objective reasonableness of the views" of the dentist. *Id*. We recognize that *Bragdon* was not an employment case. It was decided under 42 U.S.C. § 12182(b)(3), a provision of the ADA. But the Court explicitly pointed out that the ADA contains parallel language in its employment provisions, *id*. §§ 12111(3), 12113(b); *see Bragdon*, 524 U.S. at 648–49, and we see no reason not to apply *Bragdon's* analysis to employment cases.

Perhaps a more important difference between *Bragdon* and this case is that the defendant in *Bragdon* was a health-care professional, presumably a person better trained to assess dangerousness than a typical employer. Nevertheless, we believe that even nonexpert employers should be protected when they make objectively reasonable assessments, recognizing, of course, that objective reasonableness may well depend on whether professional advice is obtained. *See* 29 C.F.R. § 1630.2® ("This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence.").

Our decision in *Den Hartog v. Wasatch Academy*, 129 F.3d 1076 (10th Cir. 1997), essentially adopted an objective-reasonableness test.  We upheld the employer's direct-threat assessment because it was "eminently reasonable" in light of the "undisputed objective facts."  *Id*. at 1090.  We stated that the ADA did not require an employer to conduct "an independent medical examination when the available objective evidence is clear."  *Id*.  Moreover, the defendants' determination had been based on an "individualized assessment . . . rather than upon any predetermined or unfounded general stereotypes."  *Id*. (internal quotation marks omitted).

Similarly, in *Amego, Inc.*, 110 F.3d 135, the employee was a nurse who administered medications to severely disabled people in a residential program.  The employer dismissed her on the ground that she could not safely perform her duties.  (There was no dispute that the employee was disabled, presumably from mental disease.)  The First Circuit stated:

> It was eminently reasonable for Amego to be concerned about whether Guglielmi could meet her responsibilities, and also reasonable for it to conclude that the risk was too great to run.  The employer's judgment here about the risks of future behavior by an employee is based on past behavior and reasonable indicia of future behavior.

*Id*. at 145.  As we did in *Den Hartog*, the court also observed that there was "no evidence of differential treatment, discrimination, or stereotyping."  *Id*. at 147.

-18-

We therefore review whether the Postal Service's determination that Mr. Jarvis posed a direct threat to others was objectively reasonable.

### 2.     Application to this Case

The Postal Service does not dispute that Mr. Jarvis was an individual with a disability.  It contends only that he was not a *qualified* individual with a disability because he posed a direct threat to the safety of others.  In our view, the record compels the conclusion that the Postal Service's determination that Mr. Jarvis was a direct threat was an objectively reasonable decision.

The EEOC regulation regarding the direct-threat defense states that "[i]n determining whether an individual would pose a direct threat, the factors to be considered include:  (1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm."  29 C.F.R. § 1630.2®.  The regulation also requires that the determination be based on an "individualized assessment" that considers "the most current medical knowledge and/or . . . the best available objective evidence."  *Id*.

The evidence that the Postal Service relied on in making its determination included (1) the Nielsen incident, during which Mr. Jarvis struck Mr. Nielsen in the chest with his fist; (2) the two incidents with Ms. Frazier; (3) the letter from Sonia Hales, which Mr. Jarvis had voluntarily provided, stating that his PTSD was unlikely to dissipate and made him a threat in the workplace; and (4)

-19-

Mr. Jarvis's statements that his PTSD was getting worse and that he could no longer stop at the first blow, that if he hit someone in the right place he could kill him, and that he could not return to the workplace and be safe. It made its determination only after the interviews of Mr. Nielsen, Mr. Jarvis, and Ms. Frazier; consideration of Ms. Hales's letter; and the due-process meeting.

The evidence relied upon by the Postal Service satisfies the regulation. By its interviews, consideration of Ms. Hales's letter, and the due-process meeting, the Postal Service conducted an individualized assessment of Mr. Jarvis that relied on the best available objective evidence. We disagree with Mr. Jarvis's contention that the Postal Service should have sought further medical advice or conducted a fitness-for-duty examination. No further medical evidence was necessary after his own therapist provided the letter that he had voluntarily solicited, and which was endorsed by his own statements. The Postal Service could reasonably rely on the evidence it already had. Based on this evidence, three of the four factors in the EEOC regulation—duration, imminence, and likelihood—were clearly met. His symptoms would last indefinitely, he could erupt at any moment if startled, and it was highly likely that someone would startle him, even if inadvertently. The severity of the potential harm he posed was perhaps less clear; no one had been seriously injured. But Mr. Jarvis himself had announced that he could kill someone if he hit him in the right place (and he had the training to know what the right places were), that he could not control his

reaction to being startled and could not stop the first blow, and that he could not safely return to the workplace. Even though Mr. Jarvis points to his good record before the PTSD incidents occurred, the law does not require the Postal Service to wait for a serious injury before eliminating such a threat.

Mr. Jarvis argues that he would not have posed a direct threat if he had been reasonably accommodated. He appears to make two arguments in this regard. First, he contends that he would not have posed a threat if Ms. Bishop had simply instructed his coworkers not to startle him or approach him from behind. But even if it is appropriate to place on coworkers the burden of protecting themselves from an employee, it is hard to imagine an active workplace in which there would be no chance of accidentally startling a worker. Mr. Jarvis disputes the Postal Service's determination that Mr. Nielsen had inadvertently startled him, but Ms. Frazier was merely moving quickly in his direction when he thrust out his arm (on one occasion) and his leg (on the other occasion). The Postal Service was not required to ignore the risk of inadvertent startling.

Second, portions of Mr. Jarvis's brief suggest that he is contending that he would not have become so dangerous if he had been accommodated (by instructing coworkers not to startle him) before the Nielsen incident. There is support in the record that his PTSD changed after the incident. A psychological report dated March 28, 2005, almost two years after the incident, states that a

physician (whose report is not in the record) "was of the clear opinion that [Mr. Jarvis's] PTSD had been exacerbated after [the Nielsen incident]." Aplt. App. at 293. An undated addendum to the psychological report states, "It is the examiner's opinion that the patient has experienced a work-related emotional injury that directly followed from his prior and current diagnosis that resulted in vulnerability to the kinds of events he has reported." *Id*. at 302. But absent from the record is any evidence that without the "exacerbation" (purportedly caused by the Nielsen incident) Mr. Jarvis would not have constituted a direct threat. Nor is there evidence that the exacerbation could not have resulted from inadvertent startling. Accordingly, we affirm the district court's grant of summary judgment to the Postal Service on Mr. Jarvis's discrimination claim.

## C. Retaliation

Mr. Jarvis alleges that he was subjected to improper retaliation for requesting an accommodation—namely, that fellow employees be instructed not to startle him—and for filing complaints with the EEOC. In district court he alleged various acts of retaliation. Of those, the ones he addresses on appeal are: (1) Ms. Bishop intentionally withheld from the investigator the statement by Larry Palmer, which Mr. Jarvis claims would have exonerated him; (2) the Postal Service placed him on administrative leave; (3) the Postal Service then placed him on *unpaid* administrative leave; (4) the Postal Service did not allow him to access his accrued vacation and sick leave while he was on unpaid leave; and (5)

the Postal Service did not honor his request to delay its termination decision until his application for medical-disability retirement had been processed.

The Rehabilitation Act's prohibition on discrimination does not explicitly mention retaliation. It states:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity conducted by . . . the United States Postal Service.

29 U.S.C. § 794(a). But § 794(d) provides:

> The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 [(ADA)] (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the [ADA] (42 U.S.C. 12201 to 12204 and 12210), as such sections relate to employment.

One of the cross-referenced sections from the ADA, 42 U.S.C. § 12203(a), states:

> (a) Retaliation

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

Thus, the Rehabilitation Act, like the ADA, prohibits retaliation for protected conduct. *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 272 (4th Cir. 2001).

To establish a prima facie case of retaliation under the ADA, the employee must show "(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003) (internal quotation marks omitted). Once the plaintiff establishes a prima facie case, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), applies, and the employer must produce evidence of a legitimate, nonretaliatory reason for the adverse action, *see Doebele*, 342 F.3d at 1135. If the employer does so, the burden then shifts back to the employee to show that the proffered reason is pretextual. *See id*.

We now turn to Mr. Jarvis's specific claims. We affirm the summary judgment in favor of the Postal Service on two of the claims. But we must reverse and remand with respect to the others because they were not addressed below.

### 1.    Larry Palmer's Statement

Mr. Jarvis asserts that he engaged in protected action in May 2003 when he requested an accommodation for his PTSD from Ms. Bishop, and that her failure to forward Larry Palmer's statement to the investigator less than two months later was retaliatory. He contends that the statement would have exonerated him because it supports his contention that Mr. Nielsen had startled him intentionally,

not inadvertently. But Mr. Jarvis has failed to produce evidence that the failure to forward the statement was in retaliation for his request for accommodation. Ms. Bishop had no reason to believe that forwarding the statement would have helped him. By the time Ms. Bishop received Mr. Palmer's statement, written after the investigator had left the Spanish Fork office, the decision to place Mr. Jarvis on unpaid leave had already been made. And forwarding the letter after that time would have served no purpose: There is no evidence that the investigator played a role in the due-process meeting; and in any event, Ms. Bishop herself participated in the meeting and could have referred to Mr. Palmer's statement if it had appeared relevant. As it turned out, she would have had no reason to believe that the statement would have helped him at the meeting because he admitted that he was dangerous, drawing no distinction between his reactions to intentional and inadvertent startling. We affirm the summary judgment as to this retaliation claim.

## 2. Administrative Leave

Mr. Jarvis asserts that when the Postal Service placed him on administrative leave on July 2, 2003, it was retaliating for his request to Ms. Bishop for an accommodation of his PTSD. We can assume that he has established a prima facie case on this claim. But the Postal Service has explained that it needed to remove him from work because he posed a threat to fellow

employees. Mr. Jarvis has presented no evidence that this explanation was pretextual. We therefore affirm summary judgment as to this retaliation claim.

### 3. Other Retaliation Claims

Finally, Mr. Jarvis alleges that (1) placing him on leave without pay on July 3, 2003, (2) denying his July 8th request that he not be terminated but be allowed to retire on disability, and (3) denying his July 25th request to access his vacation and sick leave were adverse actions taken in retaliation for his request for an accommodation to Ms. Bishop in May 2003 and his filing of EEOC complaints on July 17, 2003, and thereafter. These claims do not challenge the direct-threat determination and he acknowledges that he ultimately received a disability retirement; but he asserts that the Postal Service's need to remove him from the workplace could have been accomplished with less harm to him.

Mr. Jarvis has alleged protected action, *see Butler v. City of Prairie Village, Kan.,* 172 F.3d 736, 751–52 (10th Cir. 1999) (requesting an accommodation); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997) (filing EEOC complaint), and the Postal Service has not contended that its actions were not adverse. Moreover, the temporal proximity of the adverse actions to the protected actions suffices to show the necessary causal connection, at least in the absence of substantial contrary evidence. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171–72 (10th Cir. 2006) (in retaliation case under Family and Medical Leave Act, adverse action within six weeks of protected

action sufficed to establish causal-connection element of prima facie case). Accordingly, Mr. Jarvis has presented a prima facie case and the Postal Service has the burden to offer a legitimate reason for its adverse actions. This it has failed to do. Apparently misconstruing the retaliation allegations, it has defended only the decision to remove Mr. Jarvis from work as a direct threat. In particular, it has not explained why Mr. Jarvis was denied the opportunity to retire rather than be terminated or why he was denied pay and access to accrued vacation and sick leave while he was on administrative leave. We therefore set aside the summary judgment in favor of the Postal Service on these claims and remand to the district court for further proceedings.

## III.  CONCLUSION

We AFFIRM the district court's grant of summary judgment on Mr. Jarvis's discrimination claim and his retaliation claims based on failure to transmit Mr. Palmer's statement to the investigator and on his placement on administrative leave. But we REVERSE the judgment as to his claims that the Postal Service retaliated against him by (1) denying him pay or access to his accrued leave while he was on administrative leave, and (2) terminating him rather than allowing him to take disability retirement; on those claims we REMAND for further proceedings.