# United States Court of Appeals
# for the Fifth Circuit

———————————

No. 22-50782

———————————

United States Court of Appeals
Fifth Circuit

**FILED**
August 19, 2024

Lyle W. Cayce
Clerk

Joseph Carrillo,

*Plaintiff—Appellant*,

*versus*

Union Pacific Railroad Company,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:21-CV-26

———————————————————————

Before Dennis, Engelhardt, and Oldham, *Circuit Judges*.

Per Curiam:[*]

Joseph Carrillo sued Union Pacific Railroad Company for violating the Americans with Disabilities Act. The district court granted summary judgment in favor of Union Pacific. We affirm.

——————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-50782

## I.

## A.

This case centers around safety rules developed by Union Pacific Railroad Company ("Union Pacific"). Union Pacific developed its safety rules in response to several accidents, including one where a Union Pacific engineer had a seizure while operating a train, and in response to repeated recommendations from the National Transportation Safety Board ("NTSB") to create comprehensive medical standards and enhanced fitness-for-duty requirements for employees in safety-critical positions. The NTSB specifically recommended that when the railroad learned of an employee's "potentially incapacitating or performance-impairing medical condition," the railroad prohibit the employee from performing any safety-sensitive duties until the railroad's designated physician determined that the employee could return to work safely.

As a result, Union Pacific developed a fitness-for-duty ("FFD") program in 2014 to determine if employees had impairments, such as a risk of sudden incapacitation, that could pose a safety risk. The FFD process would begin when Union Pacific learned that an employee had a seizure or loss of consciousness. Union Pacific would work with the employee to gather pertinent medical records and review said records. And Union Pacific doctors often would submit cases to outside doctors for independent evaluation. Union Pacific doctors would then make work restriction recommendations to the employee's supervisor. The supervisor would then decide on an individualized basis whether the employee could perform his essential job functions within the restrictions.

## B.

Joseph Carrillo was a diesel electrician for Union Pacific. He would inspect locomotive electrical systems, perform maintenance and repairs on

2

locomotives, and move locomotives around the railyard. As part of his job, he had to climb on top of the locomotives, lift heavy objects, and balance on elevated catwalks, running boards, and railcar roofs while making repairs. Diesel electricians like Carrillo sometimes worked on locomotives alone. Due to the safety hazards of his position, Carrillo had to meet certain physical standards, undergo extensive safety training, and abide by dozens of rules in the railyard.

One morning in June 2017, while Carrillo was at home getting ready for work, he suddenly went unconscious and bit his tongue. His wife found him lying on the floor. He reported to work and told his supervisor that he "fainted or had a seizure." His supervisor told him to stop working and reported Carrillo's remarks to his managers. Union Pacific subsequently placed Carrillo on medical leave of absence and initiated an FFD evaluation.

Carrillo then met with a series of doctors. First, he met with his primary care provider and nurse practitioner, Ms. Saenz. He told her that he fainted, bit his tongue, and woke up on the floor without any recollection of the event. He did not report any other symptoms. Ms. Saenz did not think she had enough information to provide an accurate diagnosis and ordered additional testing and follow-up appointments. She never cleared Carrillo to return to work.

Carrillo then met with cardiologist Dr. Motta. Carrillo told Dr. Motta that he was unconscious for five minutes and was very confused when he woke up. Dr. Motta ordered an exercise stress test; Carrillo failed it.

Finally, Carrillo saw neurologist Dr. Aguilar. Carrillo reported that he had constant headaches since the episode, lower back pain, anxiety episodes, issues with memory recall, and hypersensitivity in his arm, chest, abdomen, and leg. Dr. Aguilar recorded several possible diagnoses, including a single unprovoked seizure. Dr. Aguilar told Carrillo not to drive and "to avoid any

other activities in which [he] could sustain any injuries or [he] could cause injuries to others if a seizure were to recur." Carrillo saw Dr. Aguilar three additional times in a four-month period. At the last appointment, Dr. Aguilar noted that Carrillo's condition had improved, removed the activity restrictions, and recommended Carrillo continue to see his primary care provider. Dr. Aguilar never reached a definitive diagnosis, but she continued to note that Carrillo could have suffered a seizure, either unprovoked or provoked.

Carrillo submitted various diagnostic medical records to Union Pacific, including MRI, EKG, and EEG results. These records were reviewed by Dr. Charbonneau, the Union Pacific Associate Medical Director. After obtaining additional information from Carrillo, including the results of the stress test and notes made by Ms. Saenz and Dr. Aguilar, Dr. Charbonneau concluded that Carrillo likely had a seizure.

But Union Pacific did not stop there. It then submitted Carrillo's records to Dr. Frankel at the University of Nebraska for an independent evaluation. Dr. Frankel concluded that Carrillo likely experienced an isolated seizure and he was at a significant risk of sudden incapacitation for the next five years based on the best objective medical evidence.

Then another physician at Union Pacific—Dr. Holland—reviewed Carrillo's records and Dr. Frankel's report. Dr. Holland agreed with Dr. Frankel that Carrillo most likely experienced a seizure and was at risk of sudden risk of incapacitation for five years after the event. He recommended certain work restrictions for five years.

Andreas Mader, the senior manager of shop operations, reviewed Dr. Holland's report and issued safety restrictions to mitigate Carrillo's risk of future incapacitation. Based on his knowledge of Carrillo's position as a diesel electrician, Mader concluded that the restrictions interfered with

Carrillo's essential job functions, and reasonable accommodations could not be provided without removing those essential functions. Carrillo applied for other positions at Union Pacific, but Union Pacific denied his applications because each job would require him to perform tasks outside of his restrictions.

## C.

Carrillo brought multiple claims under the Americans with Disabilities Act ("ADA") against Union Pacific. The district court dismissed most of his claims and later granted summary judgment in favor of Union Pacific on his disability discrimination, or disparate treatment, claim. Carrillo timely appealed the summary judgment order.

Carrillo's disparate treatment claim is the only one before us. Our review is *de novo. See Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 414 (5th Cir. 2021). We construe all facts in favor of Carrillo as the non-moving party. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

## II.

## A.

The ADA prohibits companies from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To survive summary judgment, an employee must provide direct or circumstantial evidence of unlawful discrimination. *See Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019).

But even if an employee provides such evidence, the ADA allows employers to defend a charge of discrimination by raising a direct threat defense. *See* 42 U.S.C. § 12113(a). The defense applies where "an alleged

application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability [is] job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation." *Ibid.* In doing so, the defense balances "the importance of prohibiting discrimination against individuals with disabilities" with the unquestionable need for businesses to "protect[] others from significant health and safety risks." *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998).

The direct threat defense protects the employer even if the employer does not reach the correct diagnosis. The employer must simply make a "reasonable medical judgment" based on the "most current medical knowledge" or "the best available objective evidence," and upon an "individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quotation omitted). In doing so, courts consider (1) the duration of the risk, (2) the nature and severity of potential harm, (3) the likelihood that potential harm will occur, and (4) the imminence of potential harm. *See ibid.*; 29 C.F.R. § 1630.2(r). The direct threat defense reflects the wisdom that business necessities and "medical determinations of this sort are best left to team doctors and universities" rather than courts. *Knapp v. Northwestern Univ.*, 101 F.3d 473, 484 (7th Cir. 1996). The circuits are split on which party bears the burden to prove or disprove the direct threat defense. *EEOC v. Steel Painters, LLC*, 433 F. Supp. 3d 989, 1003 (E.D. Tex. 2020) (collecting cases).

B.

We need not take sides on that split, however, because Union Pacific easily satisfied the necessary criteria in any event.

First, Union Pacific made a reasonable medical judgment that relied on the best available objective evidence. *See Chevron*, 536 U.S. at 86. Carrillo underwent extensive cardiology and neurology examinations and sat for a battery of tests, including a stress test, an MRI, an EKG, and an EEG. Union Pacific thoroughly evaluated Carrillo's medical records, requested additional information, and submitted the case for independent review by a doctor at the University of Nebraska. Union Pacific abided by its standard, extensive FFD protocol as recommended by the NTSB. *Cf. Nall*, 917 F.3d at 346 n.8 (forbidding an employer from "chang[ing] the disqualification criteria in the middle of the evaluation to dictate that outcome"). At least five doctors evaluated Carrillo after his episode of unconsciousness: cardiologist Dr. Motta, neurologist Dr. Aguilar, Dr. Charbonneau, neurologist Dr. Frankel, and Dr. Holland. Several years later, another University of Nebraska neurologist, Dr. Diesing, corroborated Dr. Frankel's findings and Union Pacific's decision to issue restrictions. And those University of Nebraska doctors concluded that Union Pacific relied on the best objective evidence throughout and at the time of the evaluation. Even Dr. Devereaux, who met with Carrillo four years after the episode and testified on his behalf, could not rule out a seizure diagnosis and concluded that the diagnosis was "not unreasonable based on the information available."

Second, Union Pacific conducted an individualized evaluation of Carrillo's ability to perform his essential job functions. As discussed above, Carrillo went through multiple rounds of testing, interviews, and independent review. And after almost a year of these appointments, a manager—Andreas Mader—issued the final restrictions. Mader understood what was required of Carrillo as a diesel electrician. He could conclude from the doctors' reports that Carrillo could not perform his essential job

7

functions.[1] It is unclear what more Carrillo would have Union Pacific do to individualize its evaluations.

Finally, the railroad's restrictions properly accounted for the duration of the risk, the nature and severity of potential harm, the likelihood of potential harm, and the imminence of potential harm. *See* 29 C.F.R. § 1630.2(r). First, the record contains undisputed evidence that a second seizure is a high risk for several years after the first—a risk that only time can mitigate. Carrillo's own expert recognized this. Second, the nature and severity of potential harm was great. Carrillo's job required him to move or direct trains in an active railyard. He had to climb on those trains and balance on precarious catwalks as high as eighteen feet in the air. He—and everyone else in the railyard—would be significantly endangered if he suddenly lost consciousness. And the likelihood and imminence of potential harm was great. Again, Carrillo's own expert did not dispute that. Thus, there was a strong chance of harm to Carrillo, others, and Union Pacific property for several years. Union Pacific's decision to impose restrictions for five years was reasonable.

## C.

None of the evidence provided by Carrillo creates a genuine dispute of material fact. The fact that the doctors did not interview Carrillo's wife does not undermine their conclusions; Carrillo relayed her account to multiple doctors. The fact that Union Pacific's doctors did not personally meet with Carrillo also does not undermine their conclusions; these doctors

---

[1] Dr. Holland's FFD memo incorrectly notated Carrillo's job title as "Conductor." But this minor error did not affect his conclusion that Carrillo had probably suffered a seizure and should avoid activities where loss of consciousness would pose a safety risk. Beyond that, it was Mader who knew of Carrillo's responsibilities and made the final call regarding work restrictions for Carrillo.

relied on extensive medical reports submitted by the doctors who did.[2] Moreover, the direct threat defense does not require a company to mine all sources of evidence. *Cf. Jarvis v. Potter*, 500 F.3d 1113, 1124 (10th Cir. 2007) (concluding that the employer did not need to seek "further medical advice or conduct[] a fitness-for-duty examination" after it received *one* letter from an employee's therapist about his PTSD). Union Pacific's thorough year-long process was more than enough for the doctors to conclude Carrillo could not safely perform certain tasks. *See ibid.*

Nor does it matter that Union Pacific looked partly to guidance documents from the Federal Motor Carriers Safety Administration ("FMSCA") that were not peer-reviewed and were removed from the FMCSA website. It is undisputed on this record that the guidance documents were evidence-based and developed through a consensus of medical experts. And independent doctors at the University of Nebraska agreed with Union Pacific that these documents were consistent with the best evidence from the medical literature. Carrillo does not identify medical literature missing from Union Pacific's consideration, and he does not claim that Union Pacific "intentional[ly] disregard[ed]" the best objective evidence. *Nall*, 917 F.3d at 347. In fact, his own expert testified that the seizure diagnosis was not unreasonable, and he agreed that the risk of a second seizure persists for several years after an initial one.

---

[2] Moreover, none of our direct threat precedents require that an employer have its own doctors meet with or examine an employee before taking appropriate action, likely because many companies do not employ doctors on their staff. And it cannot be that Union Pacific's choice to employ medical experts like Dr. Charbonneau and Dr. Holland can be used to heighten the direct threat standard, so as to require large corporations which employ doctors to meet a higher bar than small businesses which do not. The same point applies to Union Pacific's above-and-beyond decision to refer the case to an outside doctor.

Rather, Carrillo points to one email from one doctor who opined that the guidance documents are not reliable. But that alone is insufficient to prohibit Union Pacific from consulting them as part of its FFD program. *See Bragdon*, 524 U.S. at 650. Nor is Union Pacific prohibited from consulting the guidance documents simply because they were created for vehicle carriers; Carrillo offers no reason why a railroad could not consult the documents more broadly. And after failing to adopt its own comprehensive standards, the Federal Railroad Administration encouraged railroad companies to look to regulations governing other transportation regulatory bodies. Union Pacific merely followed this instruction.

## III.

Our dissenting colleague takes issue with our analysis of the direct threat defense. With greatest respect, we disagree with his criticisms.

First, the dissenting opinion argues that Dr. Frankel, the independent doctor at the University of Nebraska, made his evaluation on "an incomplete medical record" provided by Union Pacific. *See post*, at 14 & nn. 2–3. But Dr. Charbonneau sent Dr. Frankel a comprehensive list of materials, which included Dr. Aguilar's thorough notes. And insofar as Dr. Charbonneau's cover letter might have omitted some of the facts in those notes, Dr. Frankel's report shows that he closely examined and relied on the underlying records.

Second, the dissenting opinion claims that Dr. Charbonneau disagreed with the assessments of the three medical professionals who personally examined Carrillo, thus making this case inappropriate for summary judgment. *See post*, at 12–15. But Dr. Charbonneau's assessment that Carrillo had likely suffered a seizure did not "conflict" with the findings of the other medical professionals. *Contra post*, at 14. That is because none of these individuals either ruled out a seizure diagnosis or adopted a non-seizure

diagnosis. To the contrary, Dr. Aguilar—who saw Carrillo more than the other providers—repeatedly asserted that Carrillo could have suffered from either an unprovoked or provoked seizure. And even if Dr. Charbonneau had disagreed with one of the other medical professionals, the direct threat analysis asks whether the employer made a "reasonable medical judgment," *Chevron*, 536 U.S. at 86—not whether every examining doctor came to the same exact conclusion.

Lastly, the dissenting opinion contends that Union Pacific's argument regarding its individualized assessment is undermined by the broad scope of Carrillo's work restrictions. *See post*, at 15. Insofar as an individualized assessment reveals substantial concerns about employee safety, however, broad work restrictions may be appropriate. Given the amount of time and effort that Union Pacific spend in evaluating Carrillo, the breadth of his restrictions does not undercut the company's direct threat defense.

*        *        *

There is no genuine dispute of material fact that Union Pacific's assessment and precautions were objectively reasonable. The district court therefore correctly entered summary judgment in favor of Union Pacific.

AFFIRMED.

No. 22-50782

James L. Dennis, *Circuit Judge*, dissenting:

As the majority correctly recognizes, the question before us is whether Union Pacific deprived Mr. Carrillo of his livelihood because he was a "direct threat" to the health and safety of others. As we (and the Supreme Court) have previously made clear, "an employer's direct threat determination must result from an 'individualized assessment' of the particular employee based on the 'best available objective evidence.'" *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 344 (5th Cir. 2019) (quoting *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86 (2002)). So, if "[a] reasonable jury could conclude that [the employer]" either "did not consider the 'best available objective evidence' or meaningfully engage in an 'individualized assessment' of whether [the employee] could perform the essential duties of [their job] safely," summary judgment is inappropriate. *Nall*, 917 F.3d at 343. Because a reasonable jury could do so here, I respectfully dissent.

There is sufficient evidence in the record to suggest that Union Pacific neither considered the "best available objective evidence" nor made an "individualized assessment" of Mr. Carrillo when it found that his single incident of unconsciousness was enough to determine that he had a seizure, and thus his continued employment would pose a direct threat to the safety of others.

First, the record shows that only three health care professionals ever conducted physical assessments of Mr. Carrillo, none of whom concluded that he suffered a seizure. Ms. Saenz, a nurse-practitioner and Mr. Carrillo's primary care provider, examined him shortly after the unconsciousness event but did not mention the possibility of a seizure in her examination notes. She did, however, refer him to two other doctors for further testing. One, Dr. Motta, a cardiologist, conducted a stress test, but likewise never mentioned the possibility of a seizure. The other, Dr. Aguilar, a neurologist, saw Mr.

Carrillo multiple times over the following months. During her assessments, she noted that Mr. Carrillo's EKGs and MRIs were normal and did not indicate that he had suffered a seizure. By their final medical visit, Dr. Aguilar removed the activity restrictions she had previously imposed on Mr. Carrillo due to his unconsciousness event. She was unable to conclude what caused Mr. Carrillo's episode of unconsciousness, but did list multiple possible causes, one of which was a "single unprovoked seizure." None of these healthcare professionals ever suggested that it was unsafe for Mr. Carrillo to return to work.

Despite the lack of certainty, Union Pacific did not conduct nor request any further physical examinations of Mr. Carrillo. Instead, Dr. Charbonneau, who is not a neurologist, merely reviewed Mr. Carrillo's records (not Mr. Carrillo himself), without speaking to the sole eyewitness of the unconsciousness event or Mr. Carrillo's treating physicians. Even though he lacked subject matter expertise, Dr. Charbonneau made an affirmative diagnosis that Mr. Carrillo likely suffered a seizure, when two other doctors (including a neurologist) with direct experience examining Mr. Carrillo could not do so.[1]  And when an employer relies on the assessments of doctors who lack training in the relevant field—as Union Pacific did here—over the assessments of doctors with relevant training, "a reasonable jury could conclude that [Union Pacific] failed to rely upon a reasonable medical judgment that relies on the most current medical knowledge and/or on the

_____

[1] While Mr. Carrillo's doctors included seizure as a *potential* cause of his unconsciousness episode, they explicitly determined that could not make a positive diagnosis of what likely caused his condition. "Single unprovoked seizure" was one of eight listed possible causes, one of which was just "others." Union Pacific's Dr. Holland even acknowledged that things as unthreatening as dehydration can contribute to an unconsciousness episode. However, despite having the same information and less expertise, Union Pacific still positively concluded that Mr. Carrillo suffered a seizure.

best available objective evidence." *See Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1028 (9th Cir. 2003) (internal quotations omitted) (finding that the employer's reliance on the assessment of two doctors without "any special training in liver disease" instead of subject matter experts to conclude that an employee's liver issues created a direct threat contributed to a material fact dispute); *see also Nall*, 917 F.3d at 346 (citing *Echazabal* for the proposition that "medical opinion letters from the employee's doctors, together with the employee's own declaration, raised a material fact issue as to the objective reasonableness of the employer's opinion.")

Further, while the majority touts that other doctors (University of Nebraska's Dr. Frankel and Union Pacific's Dr. Holland) agreed with Dr. Charbonneau, they made their assessments based on Dr. Charbonneau's conclusion, an incomplete medical record,[2] and without ever talking to or physically examining Mr. Carrillo.[3] The conflict between Dr. Aguilar's and Dr. Charbonneau's assessments suggests that there is indeed a dispute of material fact. Nor does the majority's interpretation of the two doctors contrasting diagnoses mesh with the unequivocal requirement that we must view "all facts and evidence in the light most favorable to [Mr. Carrillo]." *Nall*, 917 F.3d at 340. And a reasonable jury may find that the diagnoses of three doctors who never assessed the patient directly were not "the best

---

[2] When asking Dr. Frankel to review Mr. Carrillo's condition, Union Pacific failed to include the entirety of Dr. Aguilar's differential diagnosis. The referring paperwork also stated that "there was no clear explanation of why he takes [Gabepentin]," (a medicine that may be used to treat seizures), even though Mr. Carrillo had already explained that he had been taking it for two years to treat numbness from a previous elbow surgery.

[3] Like Dr. Charbonneau, these doctors never discussed the loss of consciousness incident with Mr. Carrillo's wife, the sole witness to the incident, nor any of his treating physicians.

available objective evidence." *Nall*, 917 F.3d at 344. That alone should preclude summary judgment.

The majority's citation to *Jarvis v. Potter*, 500 F.3d 1113, 1124 (10th Cir. 2007), to argue that an employer did not need to seek "further medical advice" beyond a single letter from a physician is inappropriate and unavailing. There, not only did the employee's own psychologist inform the employer that he was a direct threat to the safety of other employees, but the employee admitted himself that his PTSD caused him to be a danger to others and the diagnosis was corroborated by previous safety incidents. *Id.* A single physician's opinion might be sufficient to show a direct threat in that circumstance, but *Jarvis* does not give Union Pacific carte blanche to make summary conclusions about an individual's livelihood without so much as a physical examination.[4]

Second, there is also sufficient evidence in the record to suggest that Union Pacific failed to make a sufficiently "individualized assessment" when it implemented work restrictions preventing Mr. Carrillo from returning to work for at least five years. The restrictions themselves are so broad and vague—for instance, prohibiting Mr. Carrillo from performing work that requires "critical decision making," a term that Union Pacific does not define—that a juror could conclude they were generic, and not the product of an individualized assessment.

The "individualized" evaluations on which the restrictions were based include basic mistakes of fact. For example, when conducting his fitness for duty determination, Dr. Holland, Union Pacific's Chief Medical Officer, listed Mr. Carrillo's job title as a "conductor." He is in fact a diesel electrician, a position that obviously presents different safety concerns. Dr.

_____

[4] Or even a conversation with that individual's treating physicians.

No. 22-50782

Holland also failed to discuss Mr. Carrillo's condition with Mr. Carrillo himself or his treating physicians when making his assessment.

Further still, when formulating its work restrictions, Union Pacific relied on a medical handbook, the "Federal Motor Carrier Safety Administration Medical Evaluation Handbook" (the "FMCSA MEH"),[5] that provides guidance for vehicular commercial driving medical examinations, not examinations of diesel electricians working for railroads. Mr. Carrillo submitted expert testimony that medical experts do not consider the FMCSA MEH to be a reliable guidance for formulating work restrictions for railway workers, in part because it was not peer-reviewed, a cornerstone of good medical evidence. While Union Pacific's reliance on outdated (and likely irrelevant) guidance for commercial driving does not alone preclude summary judgment, when assessed in the light of the report which improperly identified Mr. Carrillo's job title and the subsequent imposition of generic work restrictions, it supports a finding that there is a dispute of material fact about whether Union Pacific made a sufficiently individualized assessment of whether Mr. Carrillo could return to work safely. The majority fails to cite to any support to the contrary or explain how the generic work restrictions that resulted from the review of a questionably relevant, unquestionably outdated, manual could possibly constitute an "individualized assessment" of Mr. Carrillo's circumstances.

Ultimately, the majority accepts that a superficial review of paper records by individuals without subject matter expertise is "the best available objective evidence," and that Union Pacific's generic work restrictions resulting in Mr. Carrillo's termination reflect the "result of an individualized

_____

[5] The FMCSA removed the MEH at issue, from 2014, from its website, and no longer endorses the use of the MEH for certification of commercial drivers.

assessment of the individual's present ability to safely perform the essential functions of the job." Maj. Op. at 6–7. But that is not the correct standard to apply when determining if Union Pacific has established that Mr. Carrillo presented a direct threat as a matter of law. It is not sufficient for Union Pacific to merely present a scintilla of evidence that it made a proper direct threat analysis; it must show that no "reasonable jury could conclude that [the employer]" either "did not consider the 'best available objective evidence'" or did not "meaningfully engage in an 'individualized assessment' of whether [the employee] could perform the essential duties of [their job] safely." *Nall*, 917 F.3d at 343. Because Union Pacific has not shown that here, I respectfully dissent.