**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 17-20113

United States Court of Appeals
Fifth Circuit

**FILED**

February 15, 2019

Lyle W. Cayce
Clerk

FLORA NALL, as Personal Representative of the Estate of Michael Nall, substituted in place and stead of Michael Nall, deceased,

Plaintiff – Appellant,

v.

BNSF RAILWAY COMPANY,

Defendant – Appellee.

Appeal from the United States District Court
for the Southern District of Texas—Houston
No. 4:14-CV-2819

Before ELROD, COSTA, and HO, Circuit Judges.
JENNIFER WALKER ELROD, Circuit Judge:

The panel opinion, special concurrence, and dissent previously issued in this case are withdrawn, and the following opinions are substituted in their place.

Michael Nall sued his employer, BNSF Railway Company, for disability discrimination and retaliation after he was diagnosed with Parkinson's disease and later placed on medical leave by BNSF. Because there is a fact issue as to whether BNSF discriminated against Nall, we REVERSE the grant of summary judgment to BNSF on Nall's disability discrimination claim and

No. 17-20113

REMAND for further proceedings.  Because Nall fails to identify a material fact issue regarding his retaliation claim, we AFFIRM the district court's judgment on this claim.

I.

Nall started working as a trainman with BNSF in 1973.  In 2010, he was diagnosed with Parkinson's disease.  At this time, BNSF provided Nall and his doctor with a medical status form listing the job duties of a trainman, including items such as operating track switches, applying and releasing hand brakes, monitoring track conditions, inspecting train cars and equipment, relaying various types of signals, and controlling train speed.  After Nall's neurologist cleared him to continue working, BNSF's doctor revised the form to instead contain a list of switchman duties different from the trainman duties on the previous form.  The new list added items such as "mak[ing] quick hand and leg movements," "rid[ing] on moving cars while holding onto a ladder," and "maintaining good balance and steadiness of stance/gait."

Nall continued to work with BNSF for the next year and a half without incident.  Then, in 2012, BNSF gave Nall a letter stating that a co-worker had voiced concern about Nall's ability to safely perform his job duties.  Nall was placed on medical leave and required to obtain a release from the BNSF medical department to return to work.

To begin the evaluation process, BNSF requested a copy of the results of a physical examination from Nall's neurologist that would show the doctor's awareness of BNSF's concerns and the results of any diagnostic tests performed.  Nall complied.  He submitted to BNSF a report from his neurologist recommending further evaluations by a neuropsychologist and a physical therapist.  BNSF requested that Nall complete these evaluations.  Nall again complied.  The neuropsychologist reported that he did not see any evidence of brain damage after evaluating Nall and placed Nall's skill level at

2

the low end of the average range. The occupational therapist concluded that Nall was able to meet the demands of his position at BNSF; suggested that Nall be cautious with balance situations; and added that Nall was able to perform balance tasks safely.

BNSF found some of the statements in these reports "concerning" and kept Nall on leave. BNSF emphasized that its rail yard employees "need[ ] to be able to make quick decisions and take quick actions in order to work safely" and that "[b]alance is essential to working safely as a brakeman/switchman/conductor." In addition, BNSF provided Nall with five pages of photographs depicting some of his job duties and asked for his neurologist to review them and return a statement to BNSF regarding Nall's ability to complete the depicted tasks.

Dr. Joseph Jankovic, a neurologist and the director of the Parkinson's Disease Center and Movement Disorders Clinic at the Baylor College of Medicine, reviewed the photographs. He concluded that Nall was able to perform the job duties shown in the photographs safely and was "in very good condition with balance and concentration in order." BNSF next requested that Nall perform a field test. During the test, Nall successfully completed all of the requested tasks, including taking instructions via radio, climbing on and off equipment, and walking on uneven surfaces. The physical therapist who conducted the test wrote a report in which he noted that Nall had decreased balance when reaching, a resting tremor, and slow and jerky movement patterns. Although not mentioned in the report, two BNSF employees later testified in depositions that, during the test, Nall engaged in conduct that violated two of BNSF's "eight deadly decisions"—BNSF's most serious safety rules. BNSF informed Nall that, based on the results of the field test, he could not return to work.

3

No. 17-20113

A few months later, Nall filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC). He also sent a new medical status form to BNSF showing that he could safely return to work. BNSF responded that Nall was unable to return to work because of his field test results. Nall sent another medical status form to BNSF, from another doctor, clearing him to return to work, and a new BNSF doctor, Dr. Laura Gillis, responded by classifying him as "permanently medically disqualified." The EEOC concluded its investigation and sent a letter to BNSF stating that it did not agree with BNSF that Nall was a potential harm to himself or others or that he was incapable of doing his job. Indeed, the EEOC investigator concluded that there was a violation of the Americans with Disabilities Act (ADA).

Nall and his wife filed the instant lawsuit. During the litigation process, Nall kept trying to return to work. BNSF conducted a second field test and found that Nall was still unable to perform his job duties safely. Several months later, Nall submitted records to BNSF showing that his neuropsychological testing results were "essentially the same as they were in 2012." BNSF's decision remained the same.

Against BNSF, Nall alleged disability discrimination and retaliation under the ADA and Texas Commission on Human Rights Act (TCHRA).[1] BNSF maintains that it did not discriminate against Nall because Nall was unsafe to return to work throughout the relevant time period. The district court held that Nall presented no direct evidence of discrimination, was not

---

[1] Nall also alleged age discrimination and brought a retaliation claim under the Age Discrimination in Employment Act (ADEA). However, on appeal, Nall states that he "no longer wishes to pursue his age discrimination claims." Thus, he has waived any arguments under the ADEA. *See United States v. Conn*, 657 F.3d 280, 286 (5th Cir. 2011) ("'[W]aiver is the intentional relinquishment of a known right,' and 'waived errors are entirely unreviewable.'" (quoting *United States v. Arviso-Mata*, 442 F.3d 382, 384 (5th Cir. 2006))).

qualified for his position as a trainman, failed to present evidence of pretext, and was precluded from succeeding on his claims because BNSF is entitled to a "direct threat" defense. Nall timely appealed.

## II.

We review *de novo* a district court's grant of summary judgment, viewing all facts and evidence in the light most favorable to the nonmoving party. *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016). "Summary judgment is only appropriate if the movant has shown that there is no genuine issue as to any material fact such that the movant is entitled to judgment as a matter of law." *Id.*

"An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant. In reviewing the evidence, we must draw all reasonable inferences in favor of the nonmoving party, and avoid credibility determinations and weighing of the evidence. In so doing, we must disregard all evidence favorable to the moving party that the jury is not required to believe." *Sandstad v. CB Ricard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002) (citations omitted).

## III.

"In employment discrimination cases, a plaintiff may present his case by direct or circumstantial evidence, or both."[2] *Id.* If the plaintiff produces direct evidence that discriminatory animus played a role in the employer's adverse employment decision, the burden of persuasion shifts to the defendant who must prove that it would have taken the same action despite any discriminatory animus. *Id.* If the plaintiff only produces circumstantial

---

[2] "Because TCHRA 'parallels the language of the ADA,' Texas courts follow ADA law in evaluating TCHRA discrimination claims." *Williams v. Tarrant Cty. Coll. Dist.*, 717 F. App'x 440, 444–45 (5th Cir. 2018) (quoting *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285–87 (5th Cir. 2004)). Except where we have noted otherwise, the following ADA analysis therefore applies equally to Nall's claims under the TCHRA. *See id.*

No. 17-20113

evidence of discrimination, the well-known burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), guides our inquiry. *Id.* The district court held that Nall neither presented direct evidence of discrimination nor satisfied the circumstantial-evidence requirements of *McDonnell Douglas*. We address both determinations.

A.

On appeal, Nall presents several comments by BNSF employees as direct evidence of discrimination. First, right after the initial field test, Dana Dickey, the BNSF field medical manager, allegedly told Nall that Nall was "never coming back to work" and that "they were just sending [him] paper work . . . to—you know, be nice." Second, Dr. Gillis and BNSF's manager of clinical services, Carol Wilks, allegedly told Nall's wife that "people with Parkinson's don't get better." Third, Dickey e-mailed Dr. Gillis regarding Nall's condition and whether BNSF should offer him a second field test and said that they "have to have it all documented." In response, Dr. Gillis noted that there was a low likelihood that Nall's situation would improve but that they have to ask the questions. Fourth, despite Nall's submission of several medical status forms indicating his ability to work safely, Dr. Gillis and Dickey repeatedly referenced only the first field test.

The first two statements above—that BNSF was just sending Nall paperwork to "be nice" and that "people with Parkinson's don't get better"— were the only comments presented as direct evidence of discrimination to the district court. As a result, these are the only statements we consider. *See United States v. Mix*, 791 F.3d 603, 611–12 (5th Cir. 2015) (holding that arguments not raised below are forfeited). We agree with the district court that these two statements are insufficient to constitute direct evidence.

If an inference is required for evidence to be probative as to an employer's discriminatory animus, the evidence is circumstantial, not direct. *Sandstad*,

6

No. 17-20113

309 F.3d at 897–98. Here, the evidence that Nall provides requires an inference to be probative as to any discriminatory animus. First, to find that Dickey's comments, said after the field test, are evidence of animus requires the inference that Nall was "never coming back to work" because of Nall's disorder rather than his performance on the field test. Second, Dr. Gillis's and Wilks's statements about people with Parkinson's disease could simply be an observation about the disorder. To be evidence of animus, the comment requires an inference that the irreversible nature of Parkinson's disease was the reason why Nall would not be returning to work. These comments do not constitute direct evidence; they are circumstantial evidence which we may consider only under *McDonnell Douglas*. Having so concluded, we move on to the *McDonnell Douglas* framework.[3]

B.

Under the *McDonnell Douglas* framework, Nall must first make out a *prima facie* case of discrimination by showing that: (1) he has a disability or was regarded as disabled; (2) he was qualified for the job; and (3) he was subject to an adverse employment decision because of his disability. *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 811 (5th Cir. 2016). If he does, the burden shifts to BNSF to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If BNSF satisfies its burden, the burden shifts back to Nall "to produce evidence from which a jury could conclude that [BNSF's] articulated reason is pretextual." *Cannon*, 813 F.3d at 590.

---

[3] Judge Costa's observation in his concurrence that the *McDonnell Douglas* framework can be inefficient and cumbersome is astute. However, as Judge Costa notes, Nall's attempt to prove his case by direct evidence relied only on comments by his supervisors. Beyond these comments, which we have concluded are not direct evidence, Nall attempted to prove his case using circumstantial evidence. Thus, because Nall presented only circumstantial evidence on summary judgment, it does not appear that we have the liberty to analyze this case in the streamlined manner that Judge Costa describes.

No. 17-20113

*1*. Prima facie *case*

Here, the district court concluded that Nall satisfied the first and third elements of a *prima facie* case of discrimination but failed to show the second element—that Nall was qualified for the job of a trainman. That element is the focus of this appeal.

"To be a qualified employee, [Nall] must be able to show that he could either (1) 'perform the essential functions of the job in spite of his disability,' or (2) that 'a reasonable accommodation of his disability would have enabled him to perform the essential functions of his job.'" *Id.* at 592 (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014)); *see* 42 U.S.C. § 12111(8). Nall argues that he could perform the essential functions of his job. "A function is 'essential' if it bears 'more than a marginal relationship' to the employee's job." *Cannon*, 813 F.3d at 592 (quoting *Chandler v. City of Dall.*, 2 F.3d 1385, 1393 (5th Cir. 1993), *holding modified on other grounds as discussed in Kapche v. City of San Antonio*, 304 F.3d 493 (5th Cir. 2002)). "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

In this case, the parties agree that the question of whether Nall was a qualified employee is directly related to the question of whether BNSF is entitled to a "direct threat" defense.[4] An employer is entitled to a direct threat defense if an employee poses a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *EEOC v. E.I. Du*

---

[4] While the "direct threat" defense controls our analysis of Nall's ADA claims, the TCHRA does not contain analogous statutory language, we have not found any Texas case law discussing the issue, and the parties did not brief it. Accordingly, the district court will need to address this issue on remand.

No. 17-20113

*Pont de Nemours & Co.*, 480 F.3d 724, 731 (5th Cir. 2007) (quoting 42 U.S.C. § 12111(3)); *see also* 42 U.S.C. § 12113(b).  Whether an employer has properly determined that a person poses a direct threat depends on "the objective reasonableness of [the employer's] actions." *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) ("[C]ourts should assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments[.]").  "The direct threat defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job[.]'" *Chevron USA, Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quoting 29 C.F.R. § 1630.2(r)); *see also E.I. Du Pont*, 480 F.3d at 731 ("The employer must make an 'individualized assessment of the individual's present ability to safely perform the essential function of the job.'" (citations omitted)).

Nall's arguments focus on the standard articulated in *Echazabal*: he contends that BNSF did not consider the best available objective evidence or conduct a meaningful individualized assessment because it, *inter alia*, disqualified him "with no medical basis/analysis," "kept making him jump through hoops," and "search[ed] for reasons to prevent [him] from returning to work."  Thus, the question here is whether a genuine issue of material fact exists as to whether BNSF's direct threat determination was properly made under that standard.[5]

---

[5] We do not reach the question of which party bears the burden of proof regarding the direct threat defense.  BNSF argues that because the direct threat defense is related to the second element of Nall's *prima facie* case, Nall should have the burden to prove that he could safely do his job.  In *Rizzo v. Children's World Learning Ctrs., Inc.*, 213 F.3d 209 (5th Cir. 2000) (en banc), we declined to reach the question of which party bears the burden of establishing that an individual's disability poses a direct health or safety threat to the disabled employee or others.  *Id.* at 213 & n.4.  We do so again here.  Even assuming *arguendo* that the burden is Nall's, at this stage, he has satisfied it.

No. 17-20113

Nall states in his complaint that he worked as a trainman, performing the duties of a conductor, switchman, and brakeman. According to BNSF, the duties of a conductor include maneuvering on, off, and around railcars, riding on railcars with four points of contact, hand signaling, connecting and disconnecting hoses and railcars, and "throwing" switches. Moreover, the duties of a switchman include substantially similar tasks, along with the ability "to make quick hand and leg movements" and "maintain[ ] good balance and steadiness of stance/gait."

In support of his argument that BNSF did not engage in a proper direct threat analysis, Nall points to a BNSF medical status form provided to Nall and his doctor before the list of switchman duties that includes a more limited set of trainman duties and does not mention quick movements or balance. The medical status form lists the following: operating track switches and derails, using hand brakes, monitoring track conditions and traffic, inspecting railcars and equipment, communicating signals affecting the movement of trains, and controlling the speed and clearance distance of railcars. After Nall's neurologist recommended a release to full duty for Nall based on this medical status form back in 2010, shortly after Nall had been diagnosed, a BNSF doctor provided Nall's doctor with a new list that she said "addresses the duties for which Parkinson's symptoms may be of issue." In addition, Nall cites to the testimony of BNSF's terminal manager for the yard where Nall worked. The manager testified that it is not essential to work quickly as a conductor, switchman, or brakeman.

A reasonable jury could conclude that BNSF did not consider the "best available objective evidence" or meaningfully engage in an "individualized assessment" of whether Nall could perform the essential duties of a trainman safely—and that, as a result, BNSF's direct threat determination was not objectively reasonable. First is the issue of identifying those essential duties.

10

The district court acknowledged that the job descriptions provided to the court, specifically the original medical status form and the more specific list of switchman duties, contain differences. But the court concluded that these differences do not affect the question of whether Nall was qualified because "the record demonstrated that BNSF repeatedly stated that it deemed performing job tasks safely as essential to Nall's position" and this was also reflected in the original medical status form job description. The question remains, however, what the job tasks were that Nall could allegedly not perform safely.

For our analysis, we take guidance from the ADA's definition of a "qualified individual" and consider the list of trainman duties BNSF originally provided to Nall on the medical status form that they gave to his doctor. *See* 42 U.S.C. § 12111(8) (stating that a written job description shall be considered if it was prepared "before advertising or interviewing applicants for the job"). This list did not include any reference to quick movements, balance, or steadiness. Moreover, BNSF's terminal manager testified that it was not essential to work quickly as a conductor, switchman, or brakeman. *Cf. Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257 (11th Cir. 2007) ("[W]hen considering the employer's judgment regarding what is an essential function, we have previously considered not only the company's 'official position,' but also testimony from the plaintiff's supervisor."). Taking the evidence in the light most favorable to Nall, the trainman duties listed on the medical status form are the ones we consider. Next, we address the question of whether BNSF's determination that Nall could not safely perform these tasks was objectively reasonable.

As the Supreme Court and this court have made clear, an employer's direct threat determination must result from an "individualized assessment" of the particular employee based on the "best available objective evidence," not

a categorical conclusion that an employee with a particular disability cannot safely perform a job. *See Echazabal*, 536 U.S. at 86; *Kapche*, 304 F.3d at 499 ("[T]he City's failure to assess [the employee's] abilities on an individual basis . . . stat[ed] a claim of a present and continuing violation of the ADA."). Thus, the question on appeal is not whether it was reasonable for BNSF to conclude that an employee with Parkinson's could pose a direct threat; the question is whether BNSF reasonably concluded that *Nall* posed a direct threat via an individualized assessment that relied on the best available objective evidence and was not, as Nall alleges, manipulated midstream to achieve BNSF's desired result of disqualifying him. More precisely, the question is whether there is any evidence in the record that creates a genuine issue of material fact as to whether BNSF meaningfully assessed Nall's ability to perform his job safely and reasonably concluded that he posed a direct threat.[6]

On this question, taking into consideration the reports by Nall's doctors—all of whom concluded that Nall could safely perform the tasks of a trainman listed on the medical status form that BNSF originally provided to Nall—the fact that Nall successfully completed each of the tasks presented to him during his first field test, and the comments made by BNSF employees that Nall was "never coming back to work" and that "people with Parkinson's don't get better," there is a genuine dispute. *See E.I. Du Pont*, 480 F.3d at 728,

---

[6] The dissent from our original opinion, as well as the petition for rehearing en banc and two *amicus curiae* submissions in support of it, expressed concern that the panel majority had imposed a new requirement for assertion of the direct-threat defense, *to-wit*: that in addition to showing that the employment decision was objectively reasonable, the employer must also establish that the process itself that was utilized in reaching that decision, considered separately, was objectively reasonable. Without commenting further on the efficacy of such an approach or on whether the panel majority actually adopted it, we emphasize that nothing in this substitute opinion should be understood as employing that reasoning.

731 (holding that judgment as a matter of law on direct threat defense was inappropriate where employee presented evidence she could safely perform essential job function but employer relied on disputed field test); *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 680–81, 683 (5th Cir. 1996) (reversing summary judgment where employer terminated employee for inability to perform essential function not included on lists of essential functions provided to employee and his doctor, and employee introduced evidence that the function was not essential).

The district court held that BNSF was entitled to disregard Dr. Jankovic's medical releases because they "were based on a limited set of observations and 'incomplete set of facts.'" *Hickman v. Exxon Mobile*, 2012 WL 9100358, at *9 (S.D. Tex. Sept. 27, 2012). Even if it is true that BNSF could choose to credit the opinions of its own doctors over Nall's, the evidence identified by Nall puts into question the objective reasonableness of those opinions.

The district court supported its decision with citations to our unpublished opinion in *Hickman v. Exxon Mobil*, 540 F. App'x 277 (5th Cir. 2013). In that case, the plaintiff, Hickman, argued that her employer, Exxon, failed to conduct an adequate individualized assessment of her abilities to perform her job in support of a direct threat defense because it discounted the opinion of her doctor. *See Hickman*, 2012 WL 9100358, at *9. The district court disagreed. *Id.* It characterized that doctor's decision as a "last-minute work release" and noted that two of Hickman's previous neurologists had placed work restrictions on her; that she had worked with two neurologists before she found one who would release her to return to work with only a driving restriction; and that the doctor who released her orally agreed with Exxon's doctor that his concerns regarding Hickman returning to work were legitimate. *Id.* In a short, unpublished opinion that did not discuss the

differing views of these doctors, we affirmed. *See Hickman*, 540 F. App'x at 277. This is a completely different case. And, in any event, we are not bound by *Hickman*.

Here, Nall provided medical reports from numerous doctors concluding that he could perform his job duties safely. This includes a report from a neurologist who said that Nall's "station and gait were not too abnormal"; a report from an occupational therapist who found that Nall "appeared to be able to meet the demands for various positions working for BNSF" and that he could perform balance tasks safely; a memo from Baylor College of Medicine neurologist Dr. Jankovic that he had reviewed BNSF's photographs of Nall's job duties and concluded that he was able to perform his job duties safely; a medical status form completed by Dr. Jankovic stating that Nall was able to return to work without any restrictions; and a medical status form completed by a different doctor stating that Nall was able to return to work without any restrictions.[7]

In addition, and importantly, Nall successfully completed each of the tasks required of him during his first field test. BNSF nonetheless did not reinstate Nall because he committed "[s]everal safety exceptions" during the evaluation, including making the "deadly decision" of going between moving

___

[7] With respect to timing, Nall argues on appeal that BNSF took adverse actions in: (1) April 2012, when BNSF placed him on medical leave; (2) September 2012, when BNSF informed Nall that he could not return to work; (3) December 2012 through January 2013, when BNSF again said Nall could not return to work; and (4) June through July 2013, when BNSF permanently medically disqualified him. At the district court, however, Nall argued that he was subjected to an adverse employment decision only on the last two of these four dates: December 2012 and June 2013, when Nall submitted information that he was able to return to work without restriction and BNSF still denied his requests. All of the doctor evaluations listed above were provided to BNSF before December 2012, with the exception of the second medical status form, which was sent to BNSF on December 20, 2012. Moreover, because he did not present argument regarding the first two actions to the district court, Nall has forfeited the argument that he was also subject to adverse actions in April and September 2012. *See Mix*, 791 F.3d at 611.

cars, failing to give proper hand signals, and demonstrating unsafe behavior while dismounting equipment. Later, BNSF also claimed that Nall made a second "deadly decision"—"fouling" the track, which involves walking on a part of the track that puts you at risk of being hit. Nall, however, disputes each of these allegations. With respect to the "deadly decisions," Nall testified that the cars were not moving when he started walking between them, and that he was asked to do something during the test that required him to "foul" the track. He also testified that he used a radio during the evaluation, not hand signals, and did not agree that he dismounted the railcar in a way that was unsafe.

Finally, Nall provided evidence that BNSF employees made comments that cast doubt on the propriety of BNSF's evaluation process, and, as a result, the credibility of its decision to disqualify him. Nall testified in his deposition that BNSF's field medical manager told him he was "never coming back to work" and that the company was only asking Nall for updated medical paperwork to "be nice." In addition, two BNSF employees—a doctor and the manager of clinical services—allegedly told Nall's wife that "people with Parkinson's don't get better."

Viewing the evidence in the light most favorable to Nall, as we must, there is a genuine dispute as to the objective reasonableness of BNSF's actions.[8] *See, e.g.*, *Justice v. Crown Cork & Seal Co.*, 527 F.3d 1080, 1091–92 (10th Cir. 2008) (holding that a triable issue of material fact existed as to whether the employee actually posed a direct threat to workplace safety where there was a question on whether a physical therapist's opinion could be

---

[8] We emphasize that a correct conclusion is not required to satisfy the objective reasonableness standard. What is required, however, is that BNSF consider the best available objective evidence, not categorically assume that Parkinson's will disqualify an employee, and not change the disqualification criteria in the middle of the evaluation to dictate that outcome.

considered objective, evidence indicating that the employee's restrictions may not have limited his ability to perform safely in his environment, and evidence that his employer's application of various medical judgments to the workplace was unreasonable); *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1030 (9th Cir. 2003) (holding that medical opinion letters from the employee's doctors, together with the employee's own declaration, raised a material fact issue as to the objective reasonableness of the employer's opinion); *Lowe v. Ala. Power Co.*, 244 F.3d 1305, 1309 (11th Cir. 2001) (holding that questions of fact remained as to what the essential functions of the employee's position are, and whether, assuming the disputed function was included, the employee was qualified to perform such work).

The evidence that Nall presented—that BNSF employees (1) disregarded Nall's medical release forms; (2) relied on safety violations they later identified in Nall's field test despite his successful completion of the assigned tasks; (3) changed the trainman job description to incorporate tasks that an individual with Parkinson's may have difficulty performing; and (4) made comments indicating a belief that Parkinson's categorically disqualified an individual from working as a trainman—calls into question the credibility of BNSF's decision to disqualify him. Taken together, this evidence creates a material fact issue on the question of whether BNSF considered the best available objective evidence and meaningfully engaged in an individualized assessment of Nall. Specifically, it raises a fact dispute as to whether BNSF requested particular objective evidence of Nall's ability to perform his job, only to intentionally disregard that evidence when it indicated that Nall was qualified and instead request new evidence on which to base its direct threat determination.

As discussed more fully in our pretext analysis below, it is well-accepted in employment law—and the law more generally—that inconsistent

explanations and changing requirements undermine a party's credibility. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193–94 (11th Cir. 2004) (holding that "shifting reasons allow the jury to question [the employer's] credibility" and once his "credibility is damaged, the jury could infer that he did not fire [the employee] because of the [proffered reason], but rather because of her disability"); *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) ("One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision."); *cf. United States v. Hale*, 422 U.S. 171, 177 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness."). And when an employer's credibility is undermined, it casts doubt on the reasonableness of that employer's decisions. Thus, although there is no requirement under the ADA for the employer to follow certain procedures in making a "direct threat" assessment, the language in *Echazabal* and the related EEOC regulation establishes that intentional disregard for the best available objective evidence, in whatever form it takes, undermines an employer's credibility and renders its direct threat conclusion objectively unreasonable. *See Echazabal*, 536 U.S. at 86 ("The direct threat defense must be 'based on a reasonable medical judgment *that relies on . . . the best available objective evidence*[.]'"); 29 C.F.R. § 1630.2(r). In this instance, BNSF's intentional disregard for the best available objective evidence took the form of moving the goalposts during Nall's evaluation in order to produce BNSF's desired outcome of disqualifying him. As a result, for summary-judgment purposes, Nall has established his *prima facie* case, and we move to the next steps of the *McDonnell Douglas* analysis—asking whether BNSF has articulated a legitimate, non-discriminatory reason for placing Nall on medical

leave and, if so, whether Nall has shown that the articulated reason is pretextual.[9]

### 2. *Legitimate, non-discriminatory reason and pretext*

"At summary judgment, evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive." *Diggs v. Burlington N. & Santa Fe Ry. Co.*, 742 F. App'x 1, 4 (5th Cir. 2018) (quoting *LHC Grp.*, 773 F.3d at 702). The district court held that the safety concerns emphasized by BNSF constituted a legitimate, non-discriminatory reason for BNSF to place Nall on medical leave. As we have discussed, however, viewing the evidence in the light most favorable to Nall, BNSF's safety concerns were not tied to Nall's ability to perform the tasks required of his job. He could perform those tasks. Instead, BNSF's concerns were tied to his physical impairment—his Parkinson's symptoms.

Notably, the job requirements that were added by BNSF to those of a trainman reflect abilities directly impacted by Parkinson's disease, such as the

---

[9] The district court also concluded that BNSF was entitled to a "business necessity" defense. The "direct threat" defense and the "business necessity" defense "require different types of proof." *EEOC v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000). "Direct threat focuses on the individual employee, examining the specific risk posed by the employee's disability. In contrast, business necessity addresses whether the qualification standard can be justified as an across-the-board requirement." *Id.* (citation omitted). The district court seemed to consider the qualification standard here to be a requirement that Nall could do his job safely. Thus, its analysis regarding the defense mirrored its direct threat analysis. Similarly, BNSF summarily states that the district court's separate rejection of Nall's attack on BNSF's business necessity defense was correct "[f]or the same reasons" given in support of its direct threat defense. Accepting the relevant qualification as the ability to do his job safely, we conclude that Nall has also established a fact issue regarding BNSF's entitlement to the business necessity defense under the ADA.

As with the direct threat defense, however, the district court did not address the applicability of the business necessity defense under the TCHRA, and the parties did not brief it. The district court will need to consider this on remand.

ability "to make quick hand and leg movements" and "maintain[ ] good balance and steadiness of stance/gait." This casts doubt on the legitimacy of BNSF's concerns. *See Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) ("An employer's inconsistent explanations for an employment decision 'cast doubt' on the truthfulness of those explanations."); *see also Rizzo v. Children's World Learning Ctrs., Inc.*, 213 F.3d 209, 221 (5th Cir. 2000) (en banc) (Jones, J., and Smith, J., dissenting) ("[W]e may have special cause for suspicion when an employer justifies discrimination not on the relatively concrete and more readily measurable basis of ability to perform a particular essential job function safely, but because of a proffered generalized concern about health and safety.").

Additional evidence that suggests that BNSF's explanation is false or unworthy of credence includes the reports by Nall's doctors, who concluded that Nall could safely return to work, the "never coming back to work" and Parkinson's-related statements made by BNSF employees, and the fact that BNSF continued to move the goalposts—to make requests of Nall, even as he completed the previous ones. *Cf. Diggs*, 742 F. App'x at 5 (holding that there was no fact issue regarding pretext when an employee failed to timely submit information requested by his employer, BNSF, and there was "no evidence that the company would create new information demands after [the employee] complied with previous ones").

As a result, even assuming that BNSF's alleged safety concerns were legitimate and non-discriminatory, the totality of the circumstances creates a material fact issue as to whether BNSF's proffered reasons for refusing to reinstate Nall were merely pretextual—that is, that the real reason for BNSF's adverse employment action was Nall's disability. Accordingly, on Nall's disability discrimination claims, we reverse the district court's judgment. Of course, this holding does not mean that Nall will prevail at trial or that safety

was not the real reason for BNSF's decision. It means only that Nall produced enough evidence to survive summary judgment.

## IV.

"To show an unlawful retaliation, a plaintiff must establish a *prima facie* case of (1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action. Once the plaintiff has established a *prima facie* case, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment action. If such a reason is advanced, the plaintiff must adduce sufficient evidence that the proffered reason is a pretext for retaliation. Ultimately, the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred." *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999) (footnotes omitted); *see also Feist v. La. Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013).

Here, Nall claims that the "causal link" element of his *prima facie* case is the only element in dispute. "A 'causal link' is established when the evidence demonstrates that 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity.'" *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001) (quoting *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998)).

Nall satisfies the first element of his retaliation claim by pointing to his decision to file a complaint with the EEOC in December 2012. For the second element, Nall notes that "BNSF consistently refused to reinstate him after that date, including only three weeks later on January 8, 2013." As to the third element, Nall argues that Dr. Gillis and Dickey were aware of Nall's EEOC complaint because they admit that they provided information to the EEOC through another BNSF employee. Nall argues that there is a fact issue on this element because of how burdensome BNSF made the process for Nall to be

considered "qualified" and misrepresentations BNSF made to the EEOC, including the fact that BNSF said it had not received additional information from Nall during a certain time period when it had.

Nall does not provide evidence creating a genuine issue of material fact on the "causal link" element of his retaliation claim. Although Nall sets forth some evidence to show that Dr. Gillis and Dickey, individuals involved in the decision-making process regarding Nall, eventually learned that Nall had filed a claim with the EEOC, he does not cite to any evidence that demonstrates that the subsequent decisions to keep him on leave were at all based on this knowledge. Without evidence of a causal link between the filing of his EEOC claim and his continued placement on medical leave, Nall is unable to establish a *prima facie* case of an unlawful retaliation and his retaliation claims necessarily fail.

V.

For the above reasons, we REVERSE the grant of summary judgment as to Nall's disability discrimination claims and AFFIRM the judgment as to the remaining claims. This case is REMANDED for further proceedings consistent with this opinion.

21

No. 17-20113

GREGG COSTA, Circuit Judge, specially concurring:

The question that divides the panel—whether the railroad had good reason to believe Nall posed a safety risk—should be the only issue in this case. There is no doubt the railroad fired Nall because of those alleged safety concerns and that those concerns resulted from Nall's Parkinson's. So that disability is the reason Nall was fired. *See Cannon v. Jacob Field Servs. N. America, Inc.*, 813 F.3d 586, 594 (5th Cir. 2016) (finding causation "easily resolve[d]" when a company revoked a job offer because of concerns that the applicant's shoulder injury would prevent him from climbing a ladder).

We might be uncomfortable with so readily calling the railroad's action "discrimination." Today that word is usually equated with something invidious.[1] That is for understandable, indeed laudable, reasons given our history of pernicious, pervasive, and persistent prejudice against members of certain groups. But the reality is that employers lawfully discriminate all the time in making hiring and promotion decisions. Employers discriminate based on employees' education, work experience, intelligence, and work ethic to name a few common examples. So the question often is not whether discrimination is occurring, but whether it is the type of discrimination that society, through its laws, has condemned.

---

[1] That instinct led an employer to recently argue in the Sixth Circuit that an ADA plaintiff had to show animus. *E.E.O.C. v. Dolgencorp, LLC*, 899 F.3d 428, 436 (6th Cir. 2018). In rejecting that challenge to a verdict, Judge Sutton explained that:

> the Act speaks in terms of causation, not animus. An employer violates the Act whenever it discharges an employee 'on the basis of disability' (a necessary requirement for liability), not only when it harbors ill will (a sufficient way of establishing liability). Imagine a company that fired a visually impaired employee to save itself the minimal expense of buying special software for her. Without more, that would constitute termination 'on the basis of disability,' even if all of the evidence showed that cost-savings, not animus towards the blind, motivated the company.

*Id.* at 436 (internal citations omitted).

No. 17-20113

The Americans with Disabilities Act was a long overdue recognition that discrimination against the disabled belongs in the unlawful category. That discrimination is unjust to the disabled and deprives the economy of individuals who usually can fully and effectively perform their jobs. But Congress decided that not all disability discrimination should be unlawful. Because some disabilities may prevent some people from performing some jobs safely, the ADA provides a defense if the disabled employee will pose a safety threat to himself or others. 42 U.S.C. § 12112(b)(6), 12113(b); *see also* 42 U.S.C. § 12111(8) (defining a "qualified individual" under the ADA as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position"). This "direct threat" defense draws a line not between discrimination and its absence, but between unlawful and lawful discrimination.

For cases like this one that turn on whether the disability renders the employee a safety risk (or the sometimes related statutory question whether the employee is unable to perform the essential functions of the job), there thus should not be a dispute about discriminatory intent. An employer cannot have it both ways by arguing that the termination was justified because the disability was dangerous while also maintaining that the safety-threatening disability was not the reason for the firing. When a concern about the disability's negative impact on workplace safety is the reason for the adverse action, the "causation" element of an ADA discrimination claim should be straightforward. *See Cannon*, 813 F.3d at 594; *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 762 (5th Cir. 1996); *E.E.O.C. v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018); *McMillan v. City of New York*, 711 F.3d 120, 129 (2d Cir. 2013).

Yet courts and employment lawyers are conditioned to thinking of causation as the difficult element to prove in discrimination cases; it often is the contested one in Title VII disparate treatment cases alleging race or sex discrimination. And when causation is disputed, courts and lawyers reflexively apply the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*McDonnell Douglas* is the "kudzu" of employment law. *Cf. Zadeh v. Robinson*, 902 F.3d 483, 498 (5th Cir. 2018) (Willett, J., concurring) (describing the "kudzu-like creep" of qualified immunity law). More than 57,000 court opinions have cited it. That's more than 3 cases a day (including weekends and holidays!) since the opinion was issued 45 years ago. Although courts keep trying to trim back its invasion of those parts of employment law where it does not belong—pleading standards,[2] jury instructions,[3] or appellate review of jury verdicts,[4] for example—its dominance continues.[5] As the judge-created doctrine has been widely criticized for its inefficiency and unfairness even in the space it is supposed to occupy[6]—a tool for evaluating the sufficiency of circumstantial evidence—we should not expand it beyond those bounds.[7]

---

[2] *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002) (reversing a district court's requirement that plaintiffs plead facts sufficient to raise an inference of discrimination under *McDonnell Douglas*).

[3] *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 127 (5th Cir. 1992) (explaining that a jury should not be instructed using the *McDonnell Douglas* standard).

[4] *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 993 (5th Cir. 2008) (noting that in an appeal from a jury verdict, the appellate court's focus is on whether the record supports the jury's finding of discrimination, "not on the plaintiff's *prima facie* case or the *McDonnell Douglas* framework").

[5] *See generally* Sandra F. Sperino, MCDONNELL DOUGLAS: THE MOST IMPORTANT CASE IN EMPLOYMENT DISCRIMINATION LAW (2018).

[6] *See Coleman v. Donahoe*, 667 F.3d 835, 862–63 (7th Cir. 2012) (Wood, J., concurring); *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008) (Kavanaugh, J.); D. Brock Hornby, *Over Ruled*, 21 GREEN BAG 2d 17, 22–26 (2017) (collecting extensive judicial and academic criticism of *McDonnell Douglas*); Sperino, *supra* note 6, at 317–27.

[7] *McDonnell Douglas* created the three-part framework to evaluate the evidence for a bench trial, *see* Hornby, 21 GREEN BAG 2d. at 22–23 (citing 411 U.S. at 802), as the original

No. 17-20113

I fear that is what is happening with the use of *McDonnell Douglas* to prove discrimination in Nall's case. To be sure, Nall also tried to prove discrimination with direct evidence. But in doing so, he relied on the comments of certain supervisors, which itself requires recourse to another complicated multipart test. *See Brown v. CSC Logic, Inc.,* 82 F.3d 651, 655 (5th Cir. 1996).

There is a simpler and more convincing direct evidence route. To use a modern phrase, the firing "is what it is": the railroad has all along acknowledged that it fired Nall because of concerns about his Parkinson's. That's discrimination on the basis of a disability. *See Rizzo*, 84 F.3d at 762 (explaining that the court did not need to "engage in the *McDonnell Douglas* presumptions in order to infer discrimination" because the employer did "not deny that [the employee] was removed from driving duties because of her hearing impairment"); *cf. Dolgencorp, LLC*, 899 F.3d at 435 (explaining that an employer's neutral justification does not come into play when there is direct evidence of disability discrimination). So, like many ADA cases, the hard issue in this one is not whether there was discrimination but whether that discrimination was justified.

---

Title VII did not grant a jury right (the 1991 Civil Rights Act added one, *see* 42 U.S.C. § 1981a(c)). *See generally Beesley v. Hartford Fire Ins. Co.*, 717 F. Supp. 781, 782 (N.D. Ala. 1989) (explaining that after Title VII's passage, judges in the South denied jury requests for fear that juries would ignore the Civil Rights Act's mandate); Vincenza G. Aversano, et al., *Jury Trial Right Under Title VII: The Need for Judicial Reinterpretation*, 6 CARDOZO L. REV. 613, 632–37 (1985) (suggesting that the drafters of Title VII omitted a jury right for fear that juries in the South would not give black plaintiffs a fair hearing). The Supreme Court has since endorsed its use in evaluating circumstantial evidence at the summary judgment stage to decide whether a case gets to the jury. *See, e.g.*, *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1355 (2015). At the same time, it has repeatedly admonished that the test was "'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz*, 534 U.S. at 512 (2002) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519, (1993) (quoting same); *U.S. Postal Serv. Bd. Of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting same).

This case should be an example of why *McDonnell Douglas* is not the be-all and end-all of proving discrimination. There are other ways, including that the discrimination is obvious.

No. 17-20113

JAMES C. HO, Circuit Judge, dissenting:

I applaud the panel majority for withdrawing its earlier opinion in this matter (912 F.3d 263), for the reasons stated in footnote 6 of its revised opinion. Although I would still affirm the district court for the case-specific evidentiary reasons specified in my original dissent (but which are not independently worthy of en banc review) (*see id.* at 279–83), the panel majority has now wisely obviated the need for en banc rehearing in this case, by removing the process-based theory of liability that animated its earlier opinion. There is no basis for such a legal theory under the ADA, for reasons that need not be repeated here—but are well articulated in the petition for en banc rehearing and the persuasive amicus briefs filed by the Association of American Railroads, the Center for Workplace Compliance, and the National Federation of Independent Business (*see also id.* at 283–84).