FILED
United States Court of Appeals
Tenth Circuit

December 6, 2019

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

ELENA SUMLER,

      Plaintiff - Appellant,

v.

UNIVERSITY OF COLORADO
HOSPITAL AUTHORITY,

      Defendants - Appellees.

No. 18-1443
(D.C. No.16-CV-02557-RM-KLM)
(D. Colo.)

_____

ORDER AND JUDGMENT[*]
_____

Before **BACHARACH**, **MCKAY,** and **CARSON,** Circuit Judges.
_____

This appeal involves Ms. Elena Sumler's claims under the Americans

with Disabilities Act (ADA) against the University of Colorado Hospital

Authority.[1] This statute restricts the use of medical examinations for

incoming employees and discrimination against applicants who are

regarded as disabled. 42 U.S.C. § 12112(a), (d); *Mason v. Avaya*

---

[*]    This order and judgment does not constitute binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. But the order and judgment may be cited for its persuasive value if otherwise appropriate. Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

[1]    Ms. Sumler also sued under the Rehabilitation Act. Ms. Sumler states that her Rehabilitation Act claim bears the same elements as her ADA claim. She thus declined to separately address her claim under the Rehabilitation Act. *See* Appellant's Opening Br. at 2 n.1.

*Commc'ns, Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2004). But exceptions exist, and the district court applied these exceptions in granting summary judgment to the Hospital. We affirm.

## I. The Hospital rescinded a job offer to Ms. Sumler.

Ms. Sumler applied to the Hospital for a job as a sonographer, which required these duties:

> Perform patient assessment on neonatal, pediatric, adult, and geriatric patients. Obtain, correlate, and document pertinent patient history and clinical data to support medical necessity, and facilitate optimum diagnostic results. Acquire and analyze data obtained using ultrasound; systematically use technical skills to position and obtain the best images possible. Optimize computer images to enhance diagnostic information for physical interpretation. Determine normal from pathological variants through sonographic recognition of characteristics for normal and abnormal tissue, structure, blood flow, proper patient positioning and transducer-instrument selection.

Joint App'x, vol. 2, at 265. Given the nature of these duties, the Hospital contends that sonographers need mental acuity; and Ms. Sumler does not disagree.

The Hospital offered Ms. Sumler a job as a sonographer, but the offer was conditional on an inquiry into her medical condition. The Hospital began its inquiry with a form asking about Ms. Sumler's medications, medical conditions, and work restrictions. Ms. Sumler answered that she had fibromyalgia and was taking four medications, including two narcotic pain medications (oxycodone and fentanyl). But she also reported

2

- no "medical or physical disabilities, permanent or temporary work restrictions, or weightlifting restrictions" and

- no restrictions that would "prevent [her] from performing [her] essential job functions."

*Id.* vol. 1, at 77.

A nurse for the Hospital reviewed the responses and referred Ms. Sumler for further analysis by an occupational health physician, Dr. Henry Roth. Ms. Sumler told Dr. Roth that she had a pain disorder involving (1) spinal pain, for which she received epidural steroid injections, and (2) fibromyalgia, which "invariably requires manual therapies and narcotic medication to maintain activity." *Id.* vol. 2, at 251. Dr. Roth then obtained treatment records from Dr. Joseph Brooks, a Colorado physician who had treated Ms. Sumler.

These records led Dr. Roth to seek further information from Dr. Brooks. In response, Dr. Brooks told Dr. Roth that Ms. Sumler

- could function normally and

- had previously worked as a sonographer at a different facility without any difficulty, even while taking the narcotic pain medications.

According to Dr. Roth, Dr. Brooks was "very positive about Ms. Sumler being a responsible user of prescription narcotics and in his opinion Ms. Sumler would be respectful of her medication use and the work environment." *Id.*

3

Despite this positive assessment, Dr. Roth concluded that Ms. Sumler's use of narcotic medications would interfere with her mental acuity:

> Although there may be no personally appreciable euphoria or obtundation, that is not the same as there being no measurable impairment. Current literature indicates impairment as the result of narcotic medications far exceeds the three or four hours with which lay persons commonly associate drug effects. The use of multiple medications simultaneously exacerbates the intensity and the duration of cerebral deficits.

*Id.* vol. 2, at 254. Given this conclusion, Dr. Roth recommended that the Hospital prohibit Ms. Sumler from using (1) a fentanyl patch within 24 hours of a work shift and (2) other narcotic or tranquilizing medication within 8 hours of a shift. These recommendations led the Hospital to rescind its job offer.[2]

## II. The district court granted summary judgment to the Hospital on Ms. Sumler's claims involving an improper medical examination and discrimination.

In district court, Ms. Sumler claimed that the Hospital had violated

- the ADA's medical-examination provision by using exclusionary criteria that were not job-related or consistent with business necessity and

---

[2] The Hospital contends that sonographers not only need mental acuity but also need the ability to occasionally move patients. The Hospital thus requires sonographers to be able to lift 50 pounds. In district court and our court, the Hospital argued that it had rescinded the offer in part because Ms. Sumler couldn't do the required lifting. But we need not address the impact of the lifting restriction because we rest our decision on the requirement of mental acuity.

4

- the ADA's discrimination provision because of a perception that Ms. Sumler was disabled.

The district court granted summary judgment to the Hospital on both claims, concluding as a matter of law that

- the medical inquiries were based on exclusionary criteria that were job-related and consistent with business necessity and

- Ms. Sumler could not perform the essential functions of the Hospital's sonography job.

## III.   We engage in de novo review.

We engage in de novo review of summary-judgment rulings and apply the same legal standard as the district court. *Black & Veatch Corp. v. Aspen Ins. (Uk) Ltd.*, 882 F.3d 952, 957 (10th Cir. 2018). In applying this legal standard, we consider the summary-judgment record in the light most favorable to Ms. Sumler and determine whether the Hospital has established its entitlement to judgment as a matter of law. *High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1181 (10th Cir. 2019).

## IV.   Medical-Examination Claim: The Hospital did not violate the ADA by requiring Ms. Sumler to provide information about her medical condition.

The medical-examination claim grew out of Ms. Sumler's responses to the questions about her medications, medical conditions, and work restrictions. Based on these responses, the Hospital required Ms. Sumler to meet with Dr. Roth to address her medical condition and use of narcotic

5

pain medications. Ms. Sumler claims that this procedure violated the ADA's restrictions on medical examinations. We disagree.

## A. The ADA's Restrictions on Medical Inquiries and Examinations

The ADA restricts employers from requiring medical inquiries and examinations for hiring decisions. 42 U.S.C. § 12112(d). These restrictions vary among three categories:

1. pre-offer job applications, *id.* § 12112(d)(2),

2. post-offer pre-employment examinations, *id.* § 12112(d)(3), and

3. inquiries of current employees, *id.* § 12112(d)(4).

Ms. Sumler fell into the second category, someone who had received a job offer but not yet started.

For individuals in this category, the employer may condition an offer on the results of medical inquiries and examinations if they are required for all incoming employees. 42 U.S.C. § 12112(d)(3)(A); 29 C.F.R. § 1630.14(b).[3] And if the employer uses medical inquiries or examinations to screen out employees, "the exclusionary criteria must be job-related and consistent with business necessity . . . ." 29 C.F.R. § 1630.14(b)(3).

---

[3] The district court concluded that this regulation was entitled to deference because it involved a reasonable interpretation of the ADA. Joint App'x, vol. 4, at 690. Ms. Sumler does not challenge this conclusion. To the contrary, she relies in part on the regulatory requirements.

Ms. Sumler argues that the Hospital violated these provisions by improperly requiring an in-person visit with Dr. Roth after she had answered questions about her medications, medical conditions, and work restrictions. But the Hospital required the in-person visit based on its requirement of mental acuity for sonographers. In the Hospital's view, mental acuity could be compromised by Ms. Sumler's painful conditions and use of narcotic pain medications. These concerns involved criteria that were related to performance of the sonography job and consistent with business necessity. The Hospital thus did not violate the ADA by requiring an in-person meeting with Dr. Roth.

## B.   Difference in Treatment Between Applicants and Employees

Ms. Sumler questions the necessity of the in-person visit with Dr. Roth based on a difference in the Hospital's treatment of applicants (like herself) and current employees. According to Ms. Sumler, this difference shows that the Hospital did not need more information about her medical condition or use of narcotic pain medications.

As evidence of different treatment, Ms. Sumler cites policies for current employees with medical conditions like her own. Based on these policies, Ms. Sumler argues that

- existing employees can withhold information about their medications if a physician certifies an ability to work and

- Ms. Sumler could have continued working if she'd been an existing employee because her treating physician (Dr. Brooks)

7

had certified an ability to work while taking narcotic medication.

Ms. Sumler has misread the policy for current employees. This policy does not suggest that a current employee's treating physician bears final authority over an employee's ability to return to work. Regardless of what a treating physician says, current employees can return to work only after obtaining the Hospital's approval.[4] Ms. Sumler has thus failed to create a genuine issue of material fact on the medical-examination claim.

## V. Discrimination Claim: Ms. Sumler failed to present evidence that she was qualified to perform the essential functions of the sonographer job while taking narcotic pain medications.

Ms. Sumler also challenges the district court's grant of summary judgment on the discrimination claim. On that claim, the district court reasoned that

---

[4] The policy states:

> Employees shall, when receiving prescription medication from a medical professional, inquire of the prescribing professional whether the medication has any side effects that may impair the employee's ability to perform their job and whether the side effects may create a risk to their own safety, the safety of their co-workers or the public. If the answer to either question is yes, the employee shall obtain a written statement from the medical professional indicating any recommended work restrictions and the duration of those work restrictions. *The employee shall provide this statement to Employee Health Services (EHS) and secure approval to return to work.*

Joint App'x, vol. 3, at 420 (emphasis added).

8

- "the use of mental acumen to obtain ultrasound images for a physician's diagnosis, treatment, and prevention of medical conditions" constituted an essential job function and

- Ms. Sumler's medications "cause compromised cognitive function and decision-making."

Joint App'x, vol. 2, at 696–97. We agree with the district court.

## A. The ADA's Restrictions on Discrimination in Hiring

Ms. Sumler does not allege an actual disability, but she does allege discrimination based on the Hospital's view that she was disabled.[5] (This is called a "regarded-as-disabled" claim.) To prevail, Ms. Sumler must prove that she can perform the essential functions of the job. *Adair v. City of Muskogee*, 823 F.3d 1297, 1304 (10th Cir. 2016). These functions consist of the "fundamental job duties" for a sonographer. *Mason v. Avaya*

---

[5] The burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is not useful here. We apply that framework to employment-discrimination claims that are based on circumstantial evidence of discriminatory intent. *DeWitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017). Here, however, no dispute exists concerning the Hospital's reasons for rescinding the job offer. The parties agree that the Hospital rescinded its offer based on Dr. Roth's report. *See Rakity v. Dillon Cos., Inc.*, 302 F.3d 1152, 1165 (10th Cir. 2002) (observing that the defendant "freely admit[ted] the decision not to promote [the plaintiff] was made because of [his] lifting restriction" and declining to apply the *McDonnell Douglas* framework for that reason); *accord Nall v. BNSF Ry. Co.*, 917 F.3d 335, 349–52 (5th Cir. 2019) (Costa, J., specially concurring).

*Comc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004) (quoting 29 C.F.R.
§ 1630.2(n)(1)).

Using its judgment, the Hospital decided that narcotic pain
medications impaired mental acuity; and we will not second-guess that
judgment if the prohibition against narcotic pain medication was "job-
related, uniformly enforced, and consistent with business necessity." *Id.* at
1119. In assessing relationship to the job, uniformity of enforcement, and
consistency with business necessity, courts consider "[t]he consequences
of not requiring . . . perform[ance] [of] the function." 29 C.F.R.
§ 1630.2(c)(3); *see Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877,
884 (10th Cir. 2015) (stating that "our disability-discrimination caselaw
explicitly incorporates the EEOC's regulations"). We also consider the
employer's judgment and written description of the job. 42 U.S.C.
§ 12111(8). In doing so, we give considerable weight to the employer's
judgment. *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1221–22
(10th Cir. 2016).

Ms. Sumler does not question the necessity of mental acuity for the
sonography job. The only issue is whether Ms. Sumler's painful conditions
and narcotic pain medications would interfere enough with her mental
acuity to prevent her from performing the essential functions of the job.

We've already concluded that the Hospital could require an in-person
meeting with Dr. Roth because the Hospital's criteria for mental acuity

were job-related and consistent with business necessity. In addressing mental acuity, the Hospital prohibited Ms. Sumler—as an incoming employee—from working as a sonographer while taking narcotic pain medications. This requirement was uniformly enforced, for the Hospital prohibits any employee from working under the influence of a drug if it would impair the employee's job performance. Joint App'x, vol. 1, at 121–23.[6]

This prohibition entails particular significance for the Hospital's sonographers, who acquire and analyze ultrasound data, using technical skills to

- obtain the best possible images and

- differentiate among normal and pathological variants through recognition of normal and abnormal characteristics of tissue, structure, and blood flow.

*Id.* vol. 2, at 265; *see* Part I, above. And the Hospital viewed the use of narcotic pain medication (like oxycodone and fentanyl) as incompatible with the mental acuity required for sonography.

The Hospital's judgment on the effect of narcotic pain medication was job-related, uniformly enforced, and consistent with business

---

[6]    Ms. Sumler relies on evidence that Dr. Roth didn't know of the prohibition against working under the influence of drugs. But Ms. Sumler has not presented a reason for Dr. Roth to know about this policy. His role was to assess Ms. Sumler's medical restrictions, not to express opinions on the Hospital's drug policy.

11

necessity. We thus have no reason to second-guess the Hospital's judgment. *See* p. 10, above.

## B.    The Opinions of Dr. Roth and Dr. Brooks

Ms. Sumler contends that the summary-judgment evidence allows a reasonable factfinder to determine that she could perform the essential functions of the Hospital's sonography job. For this contention, Ms. Sumler acknowledges Dr. Roth's opinion that narcotic pain medication compromised cognitive functioning and prevented performance of the job's essential functions. But Ms. Sumler contends that a factfinder could reasonably reject Dr. Roth's opinion, pointing to evidence of

- Dr. Roth's bias based on his experience in testifying for the Hospital in workers compensation cases,

- his lack of board certification in occupational health, and

- the Hospital's lack of a written policy addressing employees' use of narcotic pain medications.[7]

Ms. Sumler characterizes Dr. Roth as an interested witness whom a factfinder could reasonably disbelieve and whose testimony was thus insufficient for an award of summary judgment to the Hospital.

---

[7]    Ms. Sumler does not allege the denial of an accommodation. For example, she does not suggest that the Hospital should have reduced her hours or provided a different form of supervision. She instead argues that despite her use of narcotic pain medications, she could perform the essential functions of the sonographer position without any accommodation.

12

We disagree. Both sides agree that the Hospital rescinded the job offer because Ms. Sumler had painful conditions and needed narcotic medications to relieve her pain. The issue is whether the narcotic pain medications interfered with Ms. Sumler's ability to perform the essential functions of work as a sonographer at the Hospital. Resolution of this issue turns on how the job's essential functions are defined.

The definition of these functions was undisputed. The job required mental acuity, and Dr. Roth reported that Ms. Sumler needed to avoid taking narcotic pain medications before starting a shift. Given this report, the factfinder need not decide whether it would discount Dr. Roth's credibility for reasons like bias or lack of board certification. The issue is instead whether the Hospital reasonably, consistently, and uniformly viewed abstention from narcotic pain medication as essential to a sonographer's mental acuity.

On this issue, Ms. Sumler contrasts Dr. Roth's opinion with Dr. Brooks's. Dr. Brooks[8] opined that Ms. Sumler could perform as a sonographer job based on her

---

[8]    Dr. Brooks's own consent form for opioid therapy suggests that narcotic pain medications could compromise a patient's mental acuity. Dr. Brooks's form requires patients to state:

> I am aware that the use of such medicine has certain risks associated with it. . . . I will not be involved in an activity that may be dangerous to me or someone else if I feel drowsy or am not thinking clearly. I am aware that even if I do not notice it,

13

- past work as a sonographer at another facility and

- belief that she could perform the same job at the Hospital.

But Dr. Brooks's opinion could create a genuine issue of fact only if he had an adequate basis for his opinion. *See Vollmert v. Wis. Dep't of Transp.*, 197 F.3d 293, 298 (7th Cir. 1999) ("For an expert report to create a genuine issue of fact [on the plaintiff's ability to perform the essential functions of the job], [the expert report] must provide not merely the conclusions, but the basis for the conclusions."). And Dr. Brooks's opinion was not based on the Hospital's requirements for the sonography job. Indeed, Dr. Brooks admittedly didn't know what the Hospital required and relied solely on Ms. Sumler's belief that she could perform the job. Dr. Brooks's opinion thus doesn't undermine the Hospital's ability to define for itself the essential functions of the job.

Given the Hospital's requirements, Ms. Sumler did not present evidence of her ability to satisfy the essential functions of the sonography job. The district court thus acted correctly in granting summary judgment to the Hospital on Ms. Sumler's claim of discrimination. *See Milton v.*

---

my reflexes and reaction time might still be slowed. Such activities include but are not limited to: using heavy equipment or a motor vehicle, working in unprotected heights or being responsible for another individual who is unable to care for his/herself.

Joint App'x, vol. 2, at 277.

14

*Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995) (upholding summary judgment for the employer on a discrimination claim under the ADA based on the applicant's failure to rebut the employer's evidence involving an inability to satisfy a job requirement).

* * *

We thus affirm the district court's grant of summary judgment to the Hospital on Ms. Sumler's claims involving an improper medical examination and discrimination.

Entered for the Court


Robert E. Bacharach
Circuit Judge